SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

No. 17608.

United States Court of Appeals Ninth Circuit.

Nov. 15, 1962.

Browning, Circuit Judge, dissented.

Rollin E. Woodbury, Harry W. Sturges, Jr., and John R. Bury, Los Angeles, Cal., Graham, James & Rolph, Boris H. Lakusta, and Alexander D. Calhoun, Jr., San Francisco, Cal., for petitioner Southern Cal., Edison Co.

William M. Bennett and Mary Moran Pajalich, San Francisco, Cal., for petitioner Public Utilities Commission of State of Cal.

Ralph S. Spritzer, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, Leonard D. Eesley, Asst. Gen. Counsel, Peter H. Schiff, Milton J. Grossman, Attys., and John S. Everett, Jr., Staff Counsel, Federal Power Commission, Washington, D. C., for respondent.

Wilkinson, Cragun & Barker, John W. Cragun and Reuben Goldberg, Washington, D. C., for intervenor City of Colton, Cal.

Before CHAMBERS, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge.

This case concerns the right of the Federal Power Commission to regulate the rates at which Southern California Edison Company sells power at wholesale to the City of Colton, California. The commission asserts its right under § 201 of the Federal Power Act, 16 U.S.C. § 824, the pertinent portions of which are set forth in the margin.[1]

1. "(a) It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in sections 824–825r of this title and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

"(b) The provisions of sections 824–824h of this title shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in said sections, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."

The City of Colton is a community of approximately eighteen thousand persons located near San Bernardino in Southern California. Colton's municipal electric utility system purchases all of its energy from Edison under a contract dated October 1, 1945. The contract was filed with the California Public Utilities Commission and the state commission has exercised jurisdiction over all of Edison's sales to Colton since that time. In the exercise of its jurisdiction, the state commission has, over the protest of Colton, authorized increases in Edison's charges.

On May 9, 1958, Colton filed a petition requesting the Federal Power Commission to assert jurisdiction over the rates charged by Edison. The basis of the petition was that interstate energy was sold to Colton at wholesale and that the rates were therefore subject to Federal Power Commission control under § 201(b) of the Federal Power Act. The petition was opposed by Edison and by the California Public Utilities Commission.

Following hearings before the Federal Power Commission, that commission concluded that it had jurisdiction to regulate the rates in question and entered its order requiring Edison, among other matters, to file its rate schedules and to account for all moneys collected in excess of its July, 1954, rates. Edison has petitioned this court to review and set aside the commission's order. The California commission has joined in that petition.

Edison markets electric energy in central and southern California. It markets no energy outside of the state. It owns and operates a number of steam and hydroelectric generating stations within the state.

Edison also purchases energy generated out-of-state at Hoover, Davis and Parker Dams on the Colorado River.

Part of this energy was allocated to Edison by the United States Bureau of Reclamation from Hoover Dam generators in Arizona. In 1958 this source accounted for six per cent of the total electric energy handled by Edison, but none of it was traced to the City of Colton. The remainder of Edison's out-of-state energy supply comes from the Metropolitan Water District of California pursuant to a contract entered into in 1945 to which the United States, acting through the Secretary of the Interior, was a party. Under that contract Edison agreed to take a portion of the district's unused firm energy at specified rates to be paid to the United States for the credit of the district. A collateral contract to which the United States was not a party provided, among other things, for the transmission of this energy over the district's lines to the district's Camino switching station in California and thence by connection to Edison's 220 kv transmission system at Hayfield in California. It is some of this energy that the commission determined reaches the City of Colton, passing from Hayfield to Edison's Highgrove substation to Colton.[2]

It is apparent that authority over the initial sale to Edison in Nevada is not in issue, for the United States controls the allocation of the supply and, as a party to the resale contract, can oversee the rates. The controversy is confined to the conflicting claims of authority to regulate the wholesale rate to Colton asserted by California and the Federal Power Commission.

Federal Power Commission contends that under § 201(b) it has exclusive authority to regulate rates of all wholesale sales of interstate power. Edison contends that the extension of federal regulation to the rate to Colton would en-

2. This finding is strongly contested. Edison also contends that power generated at Hoover Dam does not fall under § 201, since the Boulder Canyon Project Act, 43 U.S.C. § 617 et seq., applies, and that under the provisions of that act Federal Power Commission is excluded from control over such power. This issue and the factual issue as to whether Hoover power actually reaches Colton we do not decide. For the purposes of our decision, we assume both issues to be determined in favor of Federal Power Commission and Colton.

croach upon subject matter specifically left to regulation by the states under § 201(a) and (b) as read together in the light of Public Utilities Commission v. Attleboro Steam & Electric Co., 1927, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. These opposing contentions present the issue before us.

▪ Legislative and judicial histories seem to us to make clear the intent and purpose of § 201(a) and (b). It was intended that states should continue to regulate where such regulation is constitutionally permissible under the commerce clause.

Passage of § 201(a) and (b) was necessitated by the decision in the Attleboro case in 1927. A regulatory void was created by that decision which it was necessary that Congress fill. That case concerned the attempt of the Rhode Island Commission to regulate the rate at which a local producing company sold power at the Rhode Island border to the Attleboro Company for resale in Massachusetts. The court recognized that, although both Rhode Island and Massachusetts had an interest in the rate charged, their interests were essentially in conflict. In this situation the court held that neither Rhode Island nor Massachusetts could regulate the rate in question without violating the commerce clause; that regulation could only be attained through congressional action. Since Congress had not acted, a regulatory void or gap resulted.

That § 201(a) and (b) was intended to go no further than to fill the "Attleboro gap" is clear from legislative history. Senate Report No. 621, 74th Congress, First Session, p. 48, states in part:

"Subsection (a) * * * declares the policy of Congress to extend that regulation to those matters which cannot be regulated by the States and to assist the States in the exercise of their regulatory powers, but not to impair or diminish the powers of any State commission."

That report also provides at page 48:

"The revision has also removed every encroachment upon the authority of the states. The revised bill would impower federal regulation only over those matters which cannot effectively be controlled by the states. The limitation on the Federal Power Commission's jurisdiction in this regard has been inserted in each section in an effort to prevent the expansion of federal authority over state matters.

\*    \*    \*    \*    \*

"The rate-making powers of the Commission are confined to those wholesale transactions which the Supreme Court held in Public Utilities Commission v. Attleboro Steam & Electric Co. (273 U.S. 83 [47 S.Ct. 294, 71 L.Ed. 549]) to be beyond the reach of the states."

The Supreme Court also has recognized that § 201(a) and (b) has such limited application. In Connecticut Light and Power Company v. Federal Power Commission, 1945, 324 U.S. 515, at 524, 65 S.Ct. 749, at 753, 89 L.Ed. 1150, the court refers to its earlier decision in Jersey Central Power and Light Company v. Federal Power Commission, 1943, 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258, in this language:

"We held that the 'primary purpose' of the 1935 amendments to the Power Act was to give the Power Commission control of sales of energy across state lines which had been held to be beyond the control of the state of export in Public Utilities Commission v. Attleboro Steam & Electric Co., 273 U.S. 83 [47 S.Ct. 294, 71 L.Ed. 549]."

In determining the extent of the regulatory void created by Attleboro, however, (and the consequent scope of federal authority) we must take the holding as Congress would have understood it as of that date. In Phillips Petroleum Company v. Wisconsin, 1954, 347 U.S. 672, 684, 74 S.Ct. 794, 800, 98 L.Ed. 1035, the Supreme Court stated, dealing with

a similar problem under the Natural Gas Act:

"But it is well settled that the gap referred to is that thought to exist at the time the Natural Gas Act was passed, and the jurisdiction of the Commission is not affected by subsequent decisions of this Court which have somewhat loosened the constitutional restrictions on state activities affecting interstate commerce, in the absence of conflicting federal regulation." [3]

Federal Power Commission contends that the Attleboro holding was founded upon the distinction between wholesale and retail sales of interstate power; that under that holding any state regulation of interstate power at wholesale must fall as in violation of the commerce clause.

While the court did lay emphasis upon this distinction, the issue is not so simple in its solution. The question may be posed thus: Under Attleboro can it be said that in absence of federal regulation this sale to Colton would have to go unregulated by California merely because it was wholesale; and in the face of the fact that California is the only state having any concern with it? Or it may be asked: Under Attleboro can a determination be attributed to Congress, through its failure to regulate this sale, that such sale should go unregulated?

The references to wholesale and retail in Attleboro must be read in context. In that case, one side relied upon Pennsylvania Gas Company v. Public Service Commission, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434; the other relied upon State of Missouri ex rel. Barrett v. Kansas

Natural Gas Company, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027. The court in Attleboro stated, 273 U.S. at page 87, 47 S.Ct. at 295:

" * * * the controlling question presented is whether the present case comes within the rule of the Pennsylvania Gas Co. case or that of the Kansas Gas Co. case upon which the Attleboro Company relies."

In both those cases, as in Attleboro, there was continuous transmission of power across a state line with the selling company doing business with customers on both sides of that line. The regulation which the sending (Attleboro) or receiving (Pennsylvania Gas) state or both (Kansas Gas) sought to impose could bear upon the ability of the selling company to serve its customers in the other state. The interstate conflict of interest was actual in Kansas Gas while only potential in Pennsylvania Gas and Attleboro, but in all three a multi-state concern with a particular transaction was essential to the factual setting of the case.

In Pennsylvania Gas the sales were retail sales by the transmitting company. In Kansas Gas the sales were at wholesale to distributing companies in the receiving state.

In Pennsylvania Gas it was held that in absence of federal regulation the rates at which the transmitting company sold at retail were subject to regulation by the consuming state, since such retail sales, amounting to local distribution, were essentially local in character.

In Kansas Gas the court held the regulation by both states to be a direct burden on interstate commerce and that the sale and delivery to the distributing com-

---

3. The jurisdictional language of the Natural Gas Act and the Power Act is essentially the same. The Natural Gas Act does not contain the express admonition that Congress intended federal regulation "to extend only to those matters which are not subject to regulation by the States." However, this Court has held that the presence of the express language in one and its absence from the other does not affect the parallel interpretation to be given the two Acts in light of the fact that the same purpose clearly appears in the legislative history of both Acts with their constant reference to Pennsylvania Gas, Kansas Gas and Attleboro. F. P. C. v. Arizona Edison Co., 9 Cir., 1952, 194 F.2d 679, 682. For the legislative history of the Natural Gas Act, see H.R.Rep. No. 709, 75th Cong., 1st Sess. (1937).

panies was "an inseparable part of a transaction in interstate commerce—not local but essentially national in character * * *."

In those two cases, as in Attleboro, there being a multi-state concern with the regulation in question and conflicting state interests in the rate charged, the regulation upon its face would appear to be essentially national. If it was to escape the commerce clause, it was necessary to show that notwithstanding the national interest, the local character should prevail. It was under these circumstances that the determining factor upon the local or national dichotomy became the question of whether the interstate sales were at wholesale or retail.

In the case at bar, however, the sale from which the interstate transmission springs is already under federal control through federal sale of the power to the Metropolitan Water District and direct federal participation in the resale to Edison. Any conceivable conflict of interest among Arizona, Nevada and California with respect to the operation of Colorado River plants and the allocation of energy from them is thus totally subject to federal regulation through the United States' position as lessor of the generators at Hoover, Parker and Davis.[4] The only other possibility of multi-state concern with the Edison-Colton sale would seem to rest upon Nevada's desire to protect Edison's customers in that state through securing for them the rate benefit which a profitable rate to Colton would permit. This possibility is nullified by the fact that Edison's sales are all within California. Nevada has no resident customers to protect. While this situation might be subject to change were Edison to begin to operate as a public utility in Nevada, Edison has never so operated in the past and has no present plans to expand its sales beyond the borders of the southern portion of California. It would be pure speculation to predict that it will serve Nevada in the future.

The lack, in this case, of any interstate conflict of interest not already subject to federal regulation is, we feel, decisive. It is one thing to say that where more than one state will feel the impact of a regulation of interstate energy, the states may regulate only sales at retail, since sales at wholesale under these circumstances remain essentially national rather than local. It is quite another thing to say, as does the Federal Power Commission, that all sales at wholesale are essentially national, irrespective of a complete lack of interest on the part of any other state.

Attleboro, as we read it, does not say this. The multi-state impact of the regulation there in question is clearly pointed out. The court states, at page 90, 47 S.Ct. at page 296:

"Furthermore, if Rhode Island could place a direct burden upon the interstate business of the Narragansett Company because this would result in indirect benefit to the customers of the Narragansett Company in Rhode Island, Massachusetts could, by parity of reasoning, reduce the rates on such interstate business in order to benefit the customers of the Attleboro Company in that State, who would have, in the aggregate, an interest in the interstate rate correlative to that of the customers of the Narragansett Company in Rhode Island. Plainly, however, the paramount interest in the interstate business carried on between the two companies is not local to either State, but is essentially national in character. The rate is therefore not subject to regulation by either of the two States in the guise of protection to their respective local interests; but, if such regulation is required it can only be attained by the exercise of the power vested in Congress."

Attleboro does not stand in isolation upon this problem of state power to regulate interstate commerce. When it was

4. See 26 F.P.C. 223, 229–230 (1961).

handed down, it was but the last in a long series of cases bearing upon the problem.

Prior to Attleboro, commencing with Cooley v. Board of Wardens of Port of Philadelphia, 1851, 53 U.S. (12 How.) 299, 13 L.Ed. 996 the Supreme Court had dealt with the matter of state regulation from a very practical point of view. Regulation which might at first blush clearly appear to have a very direct impact on what was concededly interstate commerce had been held in absence of federal regulation to be within the regulatory power of the state, for the reason that although some regulation was clearly required Congress had failed to act. These were cases in which the concern was local, the need for regulation was due to local conditions and the service was not such as to demand uniformity of regulation among the states, but was, rather, such as to permit of a diversity of regulation. Under these circumstances, the burden upon commerce which the state regulation constituted was held to be an indirect one and within the area in which state power to regulate existed concurrently with federal power until such time as Congress occupied the field.

This is illustrated, for example, by language in The Minnesota Rate Cases (Simpson v. Shepard), 1912, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511. On page 396, on page 739 of 33 S.Ct., the court points out the distinction between the impact of a direct and an indirect burden:

> "If a state enactment imposes a direct burden upon interstate commerce, it must fall regardless of Federal legislation. The point of such an objection is not that Congress has acted, but that the State has directly restrained that which in the absence of Federal regulation should be free."

The court goes on to state, at page 399, at page 740 on 33 S.Ct.:

> "The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the States with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation."

and further, at pages 402–403, at page 741 of 33 S.Ct.:

> "But within these limitations there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiscence of Congress, have been controlled by state legislation from the foundation of the Government because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence the absence of regulation by Congress in such matters has not imported that there should be no restriction but rather that the States should continue to supply the needed

rules until Congress should decide to supersede them. * * * Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the State appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal power. In such case, Congress must be the judge of the necessity of Federal action."

Can it be said that this prior judicial concern with the local need for regulation of interstate commerce has been laid to rest in Attleboro; and that by that opinion there is substituted for all the considerations theretofore regarded as relevant and irrespective of any multistate concern (in the power area, at least) the simple mechanical test of wholesale-or-retail? Can it be said that Congress would have so construed Attleboro? We think not.[5]

The cases relied upon by the Federal Power Commission to sustain their jurisdiction are distinguishable because they all involved a possible conflict of interest among two or more states without any federal regulatory authority in a position to resolve such conflicts by controlling the equitable distribution of either the power supply or the power charges among the states concerned. Illinois Natural Gas Company v. Central Illinois Public Service Co., 1942, 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371 was a case in which the local gas company, which claimed exemption from state public utilities commission jurisdiction, was a wholly owned subsidiary of an interstate pipeline company. Its function in this interstate system was to receive the gas at the state border, reduce its pressure and transport it to local distributors. In issue was an order of the state commission requiring the local wholesaler to construct facilities to serve a local distributing company not presently supplied by it with natural gas. The state commission was held to be without power to issue such an order because

---

5. Congress was well aware of the Supreme Court's interpretation of the commerce clause as is illustrated by Senator Wheeler's remarks on the constitutionality of the Holding Company part of the bill. He stated: "The criterion of constitutionality of this bill is the existence of the Federal power (U. S. v. D. & H. Co., 213 U.S. 3C6 [29 S.Ct. 527, 53 L.Ed. 836]). The Federal power over a given subject may be concurrent with that of the States or it may be exclusive, depending on the nature of the subject to be regulated.

"In Hall v. DeCuir (95 U.S. 485, 487 [24 L.Ed. 547]), the Court said:

"'* * * The States regulate, as a matter of domestic concern, the instruments of commerce situated wholly within their own jurisdictions and over which they have exclusive governmental control, except when employed in foreign or interstate commerce. As they can only be used in the State, their regulation for all purposes may properly be assumed by the State until Congress acts in reference to their foreign or interstate relations. * * * (Examples are found in the regulation of railroads by the States. See Minnesota Rate Cases, 230 U.S. 352

[33 S.Ct. 729, 57 L.Ed. 1511])'

"In Cooley v. [Board of Wardens of Port of] Philadelphia (12 How. 299 [13 L.Ed. 996]) the Court said:

"'Whatever subjects of this power (over commerce among the several States) are in their nature national, or admit only of one uniform system or plan of regulation may justly be said to be of such a nature as to require exclusive legislation by Congress.' (An example is interstate transportation of natural gas not regulated by Congress, but nevertheless held in Oklahoma v. Kansas, etc., Gas Co. (221 U.S. 229 [31 S.Ct. 564, 55 L.Ed. 716]), to be free from State regulation.)

"Certain features of the business of the utility holding and subsidiary operating companies would seem to be of this latter type, and since the business is of an interstate nature, no doubt Federal power exists, and the question is really one as to whether that power is exclusive, or whether, because many instruments of this commerce are local, the power is to be exerted only and to the extent that such instruments are employed in interstate commerce."

"the proposed extension of appellant's facilities is so intimately associated with the commerce, and would so affect its volume moving into the state and distribution among the states, as to be within the Congressional power to regulate those matters which materially affect interstate commerce, as well as the commerce itself." 314 U.S. 498, 509, 62 S. Ct. 384, 388.

In Federal Power Commission v. East Ohio Gas Company, 1950, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268, the company which the Federal Power Commission sought to subject to its jurisdiction was also, as in Illinois Gas, a subsidiary of an interstate pipeline company distributing gas wholly within one state. Jurisdiction over wholesale rates was not in issue since East Ohio sold gas direct to consumers. Although retail sales only were at stake, Federal Power Commission authority to require East Ohio to keep accounts and submit reports was upheld by finding that East Ohio's facilities were not entitled to the exemption granted facilities used for local distribution since they were part of an interstate chain of large high-pressure lines which had to be nationally controlled in order to preserve " 'equality of opportunity and treatment among the various communities and States concerned.' " 338 U.S. 464, 471, 70 S.Ct. 266, 270, quoting Kansas Gas, supra, 265 U.S. 298, 310, 44 S.Ct. 544.[6]

Finally, in United States v. Public Utilities Commission of California, 1953, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 the court fused Part I, § 20, of the Power Act with § 201 by deciding that states were forbidden to regulate sales of hydroelectric power for resale in interstate commerce, even if the source of some portion of the power sold originated in federally licensed hydroelectric projects. The sweeping statements by the court that § 201 left no authority in the states over interstate sales for resale must be read within the factual framework of the case. The dispute was between the state public utilities commission and the Federal Power Commission over the right to control the rates at which a California electric company marketing most of its power in that state sold power to the Navy Department and a Nevada county for use in Nevada. Once again a multistate concern was present since both Nevada and California regulatory agencies were interested in protecting their own citizens. Similarly, the federal government was concerned in keeping the rates at the lowest possible level for Navy use. Indeed, the dispute arose precisely because the company attempted to require the Navy and the Nevada county to adhere to a new schedule of increased rates granted by the California commission.

If the court's broad declarations (that the entire field of interstate wholesale transactions of electric energy was placed under the Federal Power Commission's jurisdiction) are to be held controlling apart from their factual context, federal regulation would govern the rates of sales between two com-

6. Both of the foregoing cases (as is also true of Jersey Central and Connecticut Light & Power, discussed infra) deal with Federal Power Commission regulation of matters other than the rates at which power is sold, matters over which the scope of federal authority is broader because of the specific federal interests and statutory provisions involved. The court in Illinois Natural Gas Company dealt with the extension of facilities for the transportation of natural gas and relied heavily upon the explicit expression of federal concern with that subject contained in 15 U.S.C. § 717f. 314 U.S. 498, 505–508, 62 S.Ct. 384. In East Ohio Gas Company the focus was on federal control under 15 U.S.C. § 717(b) of "transportation of natural gas in interstate commerce" as opposed to the "local distribution of natural gas or to the facilities used for such distribution." Any transmission of energy across state lines automatically has multistate impact with respect to allocation of energy supply, but that particular object of federal concern is effectively handled in this case by the control the United States exercises over which parties receive power from Hoover, Parker and Davis Dams.

panies wholly engaged in intrastate business and of concern to no state other than the one in which they occur. For example, in this case, were Colton to have some unused energy which it desired to sell to a nearby community such as San Bernardino for distribution to local consumers, the Federal Power Commission could intervene to set the rate of that sale regardless of the fact that only the two communities would be affected by the rate. Subsequent resales by San Bernardino to Riverside and by Riverside to Pomona would be equally subject to federal regulation although any interstate interest would be lacking. No case has yet presented such a set of circumstances to the court. We do not feel that it would go so far as to extend the language of Public Utilities Commission of California to the circumstances described above, especially in the light of its opinion in Connecticut Light & Power Co., discussed infra.

Thus, in each of these cases, as well as in the Attleboro triad, an interstate conflict of interest was prominent on the facts. When this conflict, which was the essence of the national character of the regulation at stake, was coupled with the lack of any federal supervision of the conflict, the need for federal intervention, spelled out by § 201, was clear.

The significance of the presence of some form of federal control where multistate concern with a power transaction for resale in interstate commerce exists may be seen in the contrasting cases of Jersey Central Power & Light Co. v. Federal Power Commission, 1943, 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258, Connecticut Light & Power Co. v. Federal Power Commission, 1945, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150 (cases dealing not with rate regulation, but with other subjects of power commission jurisdiction). In Jersey Central one of the issues was whether the company was a public utility within the definition of the Federal Power Act as an owner or operator of facilities for the transmission of electric energy in interstate commerce. The company owned and operated transmission lines located wholly within New Jersey, but delivered substantial power to the Public Service Company which, in turn, delivered some of it to a New York company for consumption in New York. The company argued that the arrangements by which energy passed to New York did not make it a public utility because its transmission and sale of power to Public Service Company was an intrastate transaction. The court, interpreting § 201, said:

"The purpose of this act was primarily to regulate the rates and charges of the interstate energy. If intervening companies might purchase from producers in the state of production, free of federal control, cost would be fixed prior to the incidence of federal regulation and federal rate control would be substantially impaired, if not rendered futile." 319 U.S. 61, 71–72, 63 S.Ct. 953, 959.

In Connecticut Light, the question was whether the Federal Power Commission had the right to regulate the accounting practices of a company whose facilities were used for local distribution of power. The power included electric energy purchased from another Connecticut concern but transmitted from Massachusetts. One of the company's customers was a municipality which resold a minute part of its purchase for export from the state. Federal control of the interstate conflict of interest potential in the transmission of Massachusetts power to Connecticut was already established, however, and in dispute was the necessity for extending it further to encompass the remainder of the company's business, which lacked any vital aspect of multistate concern. The court distinguished Jersey Central by stating:

"Here, however, the federal authority to fix the sale price of the energy coming from Massachusetts in interstate commerce attaches and presumably has been or at least may be exercised pursuant to the Jersey Central holding before the energy reaches this company. What peti-

tioner does or fails to do is only after the incidence of federal regulation and can in no way frustrate it." 324 U.S. 515, 524, 65 S.Ct. 749, 753.

We conclude that a state may regulate an interstate sale for resale where, as here, the original sale for interstate transmission is under federal control and no other state is affected in any way by regulation of the subsequent transaction. We therefore find that the Federal Power Commission has no authority under § 201(b) to regulate the rate at which Edison sells to the City of Colton.

Accordingly, the order of the Federal Power Commission is hereby set aside.

BROWNING, Circuit Judge (dissenting).

As the Court states, the Federal Power Act was passed by Congress explicitly to fill the "regulatory gap" created by Public Utilities Commission v. Attleboro Steam & Electric Co.[1] In Attleboro the Supreme Court interpreted its earlier decisions as sustaining state authority to regulate "the furnishing of gas to local consumers" in interstate commerce, but denying state power to regulate sales of gas "in wholesale quantities, not to consumers, but to distributing companies for resale to consumers."[2]

This, in any event, was the reading placed upon Attleboro by the Congress while considering the Act. It was repeatedly stated in the legislative proceedings that Attleboro, and the cases which it followed, had drawn the line separating federal and state constitutional authority between sales at "wholesale" or for "resale," on the one hand, and "local" sales at "retail" or to the "consumer," on the other.[3] The language of Section 201(b) reads naturally in terms of this distinction, stating that the Act is to apply to sales "at wholesale in interstate commerce" (defined as "sales for resale"), and is not to apply "to any other sale."

The Supreme Court has described the holding in Attleboro and its predecessors in terms of the same flat distinction between sales for resale and sales for consumption,[4] and has said that Congress so understood them in enacting the Federal Power Act. In United States v. Public Utilities Commission the Court said, "Congress interpreted that case [Attleboro] as prohibiting state control of wholesale rates in interstate commerce for resale, and so armed the Federal Power Commission with precisely that power."[5]

The courts have uniformly read Section 201(b) as granting the federal Commission jurisdiction over all wholesales in interstate commerce, leaving control of sales at retail to the states.[6] Cases under the Natural Gas Act, concededly applicable here, are to the same effect.

1. 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927).

2. 273 U.S. at 83–89, 47 S.Ct. at 296.

3. The following are examples of these references, and also of descriptions of the statutory grant of power in the same terms: Hearings on H.R. 5423, House Comm. on Interstate and Foreign Commerce, 74th Cong., 1st Sess. (1935), pp. 96, 384, 402, 421 ff., 435, 497, 498, 518, 521 ff., 576, 1639, 1679, 2143, 2154; S. Rep. No. 621, 74th Cong., 1st Sess., pp. 17, 48; H.Rep. No. 1318, 74th Cong., 1st Sess., pp. 7, 26; 79 Cong.Rec., 74th Cong., 1st Sess. (1935), pp. 8431, 8444.

4. United States v. Public Util. Comm'n, 345 U.S. 295, 303, 73 S.Ct. 706, 97 L. Ed. 1020 (1953); F. P. C. v. East Ohio

Gas Co., 338 U.S. 464, 470 n. 10, 70 S.Ct. 266, 94 L.Ed. 268 (1950); Panhandle E. Pipe Line Co. v. Public Serv. Comm'n, 332 U.S. 507, 514, 68 S.Ct. 190, 92 L.Ed. 128 (1947). See also Hartford Elec. Light Co. v. F. P. C., 131 F.2d 953, 964 (2d Cir. 1942).

5. United States v. Public Util. Comm'n, 345 U.S. 295, 308, 73 S.Ct. 706, 714, 97 L.Ed. 1020 (1953). See also Connecticut Light & Power Co. v. F. P. C., 324 U.S. 515, 526, 65 S.Ct. 749, 89 L.Ed. 1150 (1945). Cf. F. P. C. v. East Ohio Gas Co., 338 U.S. 464, 471–473, 70 S.Ct. 266, 94 L.Ed. 268 (1950).

6. United States v. Public Util. Comm'n, 345 U.S. 295, 311, 73 S.Ct. 706, 97 L. Ed. 1020 (1953); Wisconsin v. F. P. C., 91 U.S.App.D.C. 307, 201 F.2d 183, 185

As the Supreme Court said in Panhandle Eastern Pipe Line Co. v. Public Service Commission, "The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions were made in either category for particular uses, quantities or otherwise."[7] It is indisputable that sales at retail in interstate commerce were made subject to regulation by the state and are beyond the jurisdiction of the federal Commission even though conflicting state interests might be involved.[8] It seems clear that a similarly unqualified grant of exclusive jurisdiction over sales at wholesale in interstate commerce was vested in the Commission.

This sharp and simple division of regulatory power was not conditioned by the declaration of Section 201(a) that federal regulation is "to extend only to those matters which are not subject to regulation by the States." This general declaration of policy would be relevant "in resolving any ambiguity or indefiniteness in the specific provisions" of the Act, but it "cannot nullify a clear and specific grant of jurisdiction."[9] Before Congress it was "spoken of only as protecting state regulation of local affairs, including rates of intrastate and interstate-for-consumption sales."[10] "To conceive of it now as a benchmark of the Commission's power, or an affirmation of state authority over any interstate sales for resale, would be to speculate about a congressional purpose for which there is no support."[11]

Of course "literalness may strangle meaning,"[12] and a statute is to be read in the light of its purpose. But fixing a clear and certain boundary between federal and state jurisdiction to regulate interstate sales of power, so that its precise location need not be fought out case by case in litigation, is in itself an important objective of legislative policy. As has been said of the parallel provisions of the Natural Gas Act, "Congress undertook to regulate a defined class of natural gas distribution, without the necessity, where Congress has not acted, of drawing the precise line between state and federal power by the litigation of particular cases."[13]

To hold that sales of power at wholesale in interstate commerce are not subject to federal Commission jurisdiction unless they involve an "interstate conflict of interest not already subject to federal regulation," can only create troublesome problems.[14] Since an exist-

n. 1 (1952); Wisconsin-Michigan Power Co. v. F. P. C., 197 F.2d 472 (7th Cir. 1952).

7. Panhandle E. Pipe Line Co. v. Public Serv. Comm'n, 332 U.S. 507, 517, 68 S. Ct. 190, 195, 92 L.Ed. 128 (1947). See also Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682–684, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); Panhandle E. Pipe Line Co. v. Michigan Pub. Serv. Comm'n, 341 U.S. 329, 334, 71 S.Ct. 777, 95 L. Ed. 993 (1951); Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Comm'n, 314 U.S. 498, 506–508, 62 S.Ct. 384, 86 L.Ed. 371 (1940).

8. Panhandle E. Pipe Line Co. v. Michigan Pub. Serv. Comm'n, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951); Panhandle E. Pipe Line Co. v. Public Serv. Comm'n, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947). This, as the court points out, was true in Pennsylvania Gas Co. v. Public Serv. Comm'n, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920).

9. Connecticut Light & Power Co. v. F. P. C., 324 U.S. 515, 527, 65 S.Ct. 749, 754, 89 L.Ed. 1150 (1945). See also United States v. Public Util. Comm'n, 345 U.S. 295, 310, 73 S.Ct. 706, 97 L.Ed. 1020 (1953).

10. United States v. Public Util. Comm'n, 345 U.S. 295, 309, 73 S.Ct. 706, 714, 97 L.Ed. 1020 (1953).

11. 345 U.S. at 311, 73 S.Ct. at 715.

12. Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946).

13. Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Comm'n, 314 U.S. 498, 506, 507–508, 62 S.Ct. 384, 387, 86 L.Ed. 371 (1940). See also Wisconsin v. F. P. C., 91 U.S.App.D.C. 307, 201 F.2d 183, 185 n. 1 (1952).

14. In Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Comm'n, 314 U.S. 498, 502, 508, 62 S.Ct. 384, 385, 388, 86 L.Ed.

ing conflict between state regulatory agencies is not a prerequisite to jurisdiction of the federal Commission,[15] it is not clear why an existing (rather than potential) conflict of state interests should be required. Further, it is not clear whether the extent of the conflict of interest is relevant: would federal jurisdiction attach to the Colton contract if Edison sold one Nevada customer a small amount of power; if not, how much more would be required? Would it make a difference if power sold by Edison in a state other than California were also traceable to a federal generator so that the first sale was controlled by an agency of the federal government? If at some future time federal jurisdiction were to attach to the Colton contract because of sales of power by Edison in states other than California, would the federal jurisdiction

over the Colton contract be dependent upon continuance of these sales? Does the requirement of interstate conflict also apply to federal jurisdiction over interstate transmission; or is it limited to interstate sales?[16] And if no existing conflict of interest between states is involved, is the interstate sale to be left unregulated if the state concerned does not undertake to regulate it?

If it is desirable that regulation of contracts like that with Colton be left to the state, the task of modifying Section 201(b) to accomplish that purpose is one for Congress. Congress could move the jurisdictional line without obscuring it; Congress could require state-by-state assumption of regulatory responsibility before federal controls were withdrawn.[17]

371 (1940), the Court suggests that the federal Commission's authority extends to sales of gas for resale following other sales for resale of the same energy which are within the Commission's jurisdiction. The same understanding of the coverage of the Act is reflected in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 682 n. 10, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954), where the court refers to the comment of the General Solicitor of the National Association of Railroad and Utilities Commissioners that the purpose of certain changes ultimately included in the Act was "to make certain that the bill will apply to all intercompany sales of natural gas at wholesale, even though the sale be from one company to another company which will resell to another corporation before the gas in finally sold to the public." Hearings before House Comm. on Interstate and Foreign Commerce on H.R. 4008, 75th Cong., 1st Sess. 22.

15. Only California had sought to regulate the rates involved in United States v. Public Util. Comm'n, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1953). In that case as in this, Nevada withheld a potential claim to regulatory jurisdiction.

16. The Court's discussion of Illinois Nattural Gas Co. v. Central Illinois Pub.

Serv. Comm'n, 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371 (1942), and F. P. C. v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), suggests as much, though it is difficult to find a basis for such a distinction in the statute itself.

17. In a comparable situation the Supreme Court adhered to the jurisdictional test of the Natural Gas Act [F.P.C. v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950)] and Congress then enacted a clear and limited exception in favor of "any person engaged in * * * the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State * * * provided that the rates * * * of such persons * * * be subject to regulation by a State commission. * * * A certification from such State commission to the Federal Power Commission that such State Commission has regulatory jurisdiction over [such] rates * * * and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction." 15 U.S.C.A. § 717(c). See S.Rep. No. 817, 83d Cong., 2d Sess.