FEDERAL POWER COMMISSION *v.* SOUTHERN CALIFORNIA EDISON CO. ET AL.

No. 71. Argued January 14, 1964.—Decided March 2, 1964.*

*Together with No. 73, *City of Colton* v. *Southern California Edison Co. et al.,* also on certiorari to the same court.

*Ralph S. Spritzer* argued the cause for petitioner in No. 71. With him on the briefs were *Solicitor General Cox, Frank Goodman, Richard A. Solomon, Howard E. Wahrenbrock, Thomas M. Debevoise* and *Peter H. Schiff.*

*John W. Cragun* argued the cause for petitioners in No. 73. With him on the brief were *Reuben Goldberg* and *Angelo A. Iadarola.*

*Boris H. Lakusta* and *John R. Bury* argued the cause for respondent Southern California Edison Co. With them on the brief were *Rollin E. Woodbury* and *Harry W. Sturges, Jr. Mary Moran Pajalich* argued the cause for respondent Public Utilities Commission of California. With her on the brief was *J. Thomason Phelps.*

*Northcutt Ely* and *C. Emerson Duncan II* filed a brief for the American Public Power Association, as *amicus curiae,* urging reversal.

*Austin L. Roberts, Jr.* filed a brief for the National Association of Railroad and Utilities Commissioners, as *amicus curiae,* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioner City of Colton, California (Colton), purchases its entire requirements of electric power from respondent Southern California Edison Company (Edison), a California electric utility company which operates in central and southern California and sells energy only to customers located there. Colton applies some of the power purchased to municipal uses, but resells the bulk of it to thousands of residential, commercial, and industrial customers in Colton and its environs. Respondent Public Utilities Commission of California (PUC) had for some years exercised jurisdiction over the Edison-Colton sale, but petitioner Federal Power Com-

mission (FPC), on Colton's petition filed in 1958, asserted jurisdiction [1] under § 201 (b) of the Federal Power Act which extends federal regulatory power to the "sale of electric energy at wholesale in interstate commerce." 49 Stat. 838, 847, 16 U. S. C. §§ 791a, 824–824h.[2]  The

---

[1] Colton presently purchases its requirements from Edison under a 10-year contract made in 1945 which continues in effect from month to month after the end of the term until terminated by either party by written notice. The contract was filed with the PUC, and it was in 1958, after PUC approved a second increase in the contract rates, that Colton requested FPC to institute an investigation to determine if the Edison-Colton sale was subject to federal jurisdiction. An investigation was made and a hearing ordered. The staff of FPC, Colton, PUC and Edison participated in the hearings which followed. The staff of FPC and Colton supported FPC jurisdiction but Edison and PUC opposed. The Hearing Examiner ordered the dismissal of Colton's petition and the FPC reversed. Federal jurisdiction was found to have attached as of July 1, 1954. Edison was ordered to file the 1945 contract and to cease and desist from charging Colton in excess of the contract rates without FPC authorization. Edison was also required to account for sums in excess of those rates collected on and after July 1, 1954, and to establish a special reserve account for that excess with interest. 26 F. P. C. 223.

[2] Section 201 in pertinent part is as follows:

"(a) It is hereby declared that . . . Federal regulation of . . . the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

"(b) The provisions of this Part shall apply to . . . the sale of electric energy at wholesale in interstate commerce . . . . The Commission shall have jurisdiction over all facilities for such . . . sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following, over . . . facilities used in local distribution . . . .

.            .            .            .            .

"(d) The term 'sale of electric energy at wholesale' when used in this Part means a sale of electric energy to any person for resale.

"(e) The term 'public utility' when used in this Part or in the Part next following means any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part."

Court of Appeals for the Ninth Circuit set aside the FPC order. 310 F. 2d 784.

Some of the energy which Edison markets in California originates in Nevada and Arizona. Edison has a contract with the Secretary of the Interior under which, as agent for the United States, it generates energy at the Hoover power plants located in Nevada. This contract allocates to Edison 7% of the total firm generating capacity of Hoover Dam.[3] Edison is also a party to a 1945 contract with the United States and the Metropolitan Water District of Southern California under which it is entitled to a portion of the unused firm energy allocated to the Water District from Hoover Dam. Payment for this energy is made to the United States for the credit of the Water District. Also, Hoover Dam, Davis Dam in Arizona, and Parker Dam in California are interconnected by a transmission line from which Edison has drawn energy by agreement with the Water District.

The FPC found, on the extensive record made before a Hearing Examiner, that out-of-state energy from Hoover Dam was included in the energy delivered by Edison to Colton, and ruled that the "sale to Colton is a sale of electric energy at wholesale in interstate commerce subject to Sections 201, 205 and 206 of the Federal Power Act." 26 F. P. C. 223, 231.[4]

The Court of Appeals did not pass upon the question whether the finding that out-of-state energy reached Col-

---

[3] While Edison admits that it is a "public utility" within the meaning of § 201 (e) of the Federal Power Act by virtue of its ownership of two interstate transmission lines running from Hoover Dam to its Chino substation in California, its status as a public utility does not decide the question whether the FPC may assert jurisdiction over the rates of the Edison-Colton sale. Cf. *Connecticut Light & Power Co.* v. *Federal Power Comm'n*, 324 U. S. 515.

[4] FPC regulation of rates rests on §§ 205 (a) and 206 (a), 16 U. S. C. §§ 824d, 824e.

ton has support in the record.[5]   The court assumed that the finding had such support, but held nevertheless that § 201 (b) did not grant jurisdiction over the rates to the FPC.   It ruled that the concluding words of § 201 (a)— "such Federal regulation, .however, [is] to extend only to those matters which are not subject to regulation by the States"—confined FPC jurisdiction to those interstate wholesales constitutionally beyond the power of state regulation by force of the Commerce Clause, Art. I, § 8, of the Constitution.   Accordingly, it held that the

---

[5] The briefs of PUC and Edison argue that the FPC's finding that some out-of-state energy is delivered by Edison to Colton is not supported by substantial evidence in the record.   Among other findings, the FPC found: "On the basis of the record, electric energy generated at Hoover was sold to Colton during 596 hours out of 598 hours in the last six months of 1954, 1,338 hours out of 2,065 in 1955, 270 hours out of 1,954 in 1956, 199 hours out of 1,388 in 1957, and 1,115 hours out of 1,479 in 1958; and these deliveries included Davis energy during 341 hours in 1954, 746 hours in 1955 and 31 hours in 1956." 26 F. P. C., at 231.   Of course, under the Act "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 313 (b).   We have said of Part II of the Power Act that "federal jurisdiction was to follow the flow of electric energy, *an engineering and scientific, rather than a legalistic or governmental. test.*"   *Connecticut Light & Power Co.* v. *Federal Power Comm'n,* 324 U. S. 515, 529.   (Emphasis supplied.)   We have examined the proofs.   They are in sharp conflict but we hold that the engineering and scientific evidence received by the Commission on the subject from the Commission's own experts afforded substantial evidence upon which to rest the findings which trace out-of-state energy to the City of Colton.

The PUC also argues that any out-of-state energy was *de minimis* in amount and that FPC jurisdiction did not attach on that account. But that fact would be relevant only on the question whether Edison was a "public utility" over which FPC in its discretion should assume jurisdiction, *Connecticut Light & Power Co.* v. *Federal Power Comm'n, supra,* pp. 535–536.   Here Edison is concededly a "public utility" and we agree with the FPC that in that circumstance the FPC has "no discretion to reject that jurisdiction." 26 F. P. C., at 236.

FPC had no jurisdiction because PUC regulation of the Edison-Colton sale was permissible under the Commerce Clause. Because of the importance of the question in the administration of the Federal Power Act we granted the separate petitions for certiorari of the FPC and Colton. 372 U. S. 958. We reverse. We hold that § 201 (b) grants the FPC jurisdiction of all sales of electric energy at wholesale in interstate commerce not expressly exempted by the Act itself,[6] and that the FPC properly asserted jurisdiction of the Edison-Colton sale.

The view of the Court of Appeals was that the limiting language of § 201 (a), read together with the jurisdictional grant in § 201 (b), meant that the FPC could not assert its jurisdiction over a sale which the Commerce Clause allowed a State to regulate. Such a determination of the permissibility of state regulation would require, the Court of Appeals said, an analysis of the impact

---

[6] Section 201 (b) expressly excludes FPC jurisdiction "over facilities used in local distribution." Edison and PUC raise in their briefs the question whether federal jurisdiction over the sale of electric energy by Edison to Colton is prevented by the "local distribution" proviso of § 201 (b). Whether facilities are used in local distribution—although a limitation on FPC jurisdiction and a legal standard that must be given effect in addition to the technological transmission test, *Connecticut Light & Power Co.* v. *Federal Power Comm'n, supra,* p. 531—involves a question of fact to be decided by the FPC as an original matter. The FPC found in this case that "there are facilities owned by Edison which it uses exclusively to effect the wholesale to Colton and not for local distribution. These include the City of Colton substation and portions of the 12 kv. Globe mills and Derby lines after service to the last customer at retail. . . . The fact that the 12 kv. lines . . . serve an industrial customer, several lighted highway signs, a residence and a railroad section house before they reach the transformers in the Colton City Substation does not transform them into local distribution lines even if this were relevant." 26 F. P. C., at 232. The findings have ample support in the evidence and the conclusion may properly rest upon the specialized experience of the FPC in determining such questions.

of state regulation of the sale upon the national interest in commerce. The court held that such an analysis here compelled the conclusion that the FPC lacked jurisdiction, because state regulation of the Edison-Colton sale would not prejudice the interests of any other State. This conclusion was rested upon the view that the interests of Arizona and Nevada, the only States other than California which might claim to be concerned with the Edison-Colton sale, were already given federal protection by the Secretary of the Interior's control of the initial sales of Hoover and Davis energy. Since the first sale was subject to federal regulation, and since the energy subsequently sold by Edison to Colton for resale was to be consumed wholly within California, there was said to be a "complete lack of interest on the part of any other state," and the sale was therefore held to be subject to state regulation and exempt from FPC regulation. 310 F. 2d, at 789.

The Court of Appeals expressly rejected the argument that § 201 (b) incorporated a congressional decision against determining the FPC's jurisdiction by such a case-by-case analysis, and in favor of employing a more mechanical test which would bring under federal regulation all sales of electric energy in interstate commerce at wholesale except those specifically exempted, and would exclude all retail sales. In reviewing the court's ruling on this question we do not write on a clean slate. In decisions over the past quarter century we have held that Congress, in enacting the Federal Power Act and the Natural Gas Act, apportioned regulatory power between state and federal governments according to a test which this Court had developed in a series of cases under the Commerce Clause. The Natural Gas Act grew out of the same judicial history as did the part of the Federal Power Act with which we are here concerned; and § 201 (b) of the Power Act has its counterpart in § 1 (b)

of the Gas Act, 15 U. S. C. § 717 (b), which became law three years later in 1938.[7]

The test adopted by Congress was developed in a line of decisions beginning with *Public Utilities Comm'n* v. *Landon,* 249 U. S. 236, and *Pennsylvania Gas Co.* v. *Public Service Comm'n,* 252 U. S. 23. In those cases this Court held that the Commerce Clause does not prohibit a State from regulating the sale of gas directly to consumers even though the gas be drawn from interstate mains. *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 309, sketched in the other side of the picture by holding that a State is prohibited from regulating the rate at which gas from out-of-state is sold to independent distributing companies for resale to local consumers. The last decision in this line, and the one which directly led to congressional intervention, was *Public Utilities Comm'n* v. *Attleboro Steam & Elec. Co.,* 273 U. S. 83. There the Public Utilities Commission of Rhode Island asserted jurisdiction over the rates at which a Rhode Island company sold energy generated at its Rhode Island plant to a Massachusetts company, which took delivery at the state line for resale to the City of Attleboro. The Court held that *Kansas Gas, supra,* controlled, that the case did not involve "a regulation of the rates charged to local consumers," and that since the sale was of concern to both Rhode Island and Massachusetts it was "national in character." Consequently, "if such regulation is required

---

[7] Section 1 (b) of the Natural Gas Act is:

"The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 52 Stat. 821 (1938), 15 U. S. C. § 717 (b).

it can only be attained by the exercise of the power vested in Congress." 273 U. S., at 89–90.

Congress undertook federal regulation through the Federal Power Act in 1935 and the Natural Gas Act in 1938. The premise was that constitutional limitations upon state regulatory power made federal regulation essential if major aspects of interstate transmission and sale were not to go unregulated. *Attleboro,* with the other cases cited, figured prominently .in the debates and congressional reports.[8] In *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.,* 314 U. S. 498, we

---

[8] See S. Rep. No. 621, 74th Cong., 1st Sess., pp. 17–54 (1935); H. R. Rep. No. 1318, 74th Cong., 1st Sess., pp. 7–8 (1935). The hearings before both the House and Senate Committees reflect the general consensus that under *Attleboro* and the earlier decisions, the Commerce Clause denied the States power over any wholesale transaction in interstate commerce. Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess., pp. 96, 384, 402, 421–422, 435, 497–498, 518, 521–523, 1612, 1614, 1622–1623, 1629, 1639, 1642, 1656–1657, 1679, 2143, 2144, 2156 (1935); Hearings before the Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st Sess., pp. 250–251, 760, 767, 768, 800–801 (1935). The general solicitor of the National Association of Railroad & Utilities Commissioners said during the House hearings: "That case [*Attleboro*] has been accepted by everybody as establishing . . . the fact that the State cannot regulate wholesale transactions, although it can regulate retail service and rate." Hearings on H. R. 5423, *supra,* p. 1657. At the Senate hearings he said: "The second part of the bill [§ 201 (b)] provides for regulation by the Federal Government of wholesale transactions in electric power. Those are transactions which the United States Supreme Court has held are beyond the reach of the States under the Constitution. The States have long regulated the rates charged by the local distributing companies to consumers; but they cannot reach the interstate producer supplying the distributing company." Hearings on S. 1725, *supra,* pp. 756–757. "It therefore follows that if there is to be any regulation of the wholesale part of the electric and gas business which passes over State lines it must be supplied by the Federal Government." *Id.,* p. 768.

were first required to determine the scope of the federal power which Congress had asserted to meet the problem revealed by *Attleboro* and the other cases. The specific question in that case was whether a company selling interstate gas at wholesale to distributors for resale in a single State could be required by that State's regulatory commission to extend its facilities and connect them with those of a local distributor, or whether such extensions were exclusively a matter for the FPC. The Court noted that prior to the Natural Gas Act there had been another line of cases which adopted a more flexible approach to state power under the Commerce Clause; these cases had been "less concerned to find a point in time and space where the interstate commerce in gas ends and intrastate commerce begins, and [have] looked to the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce." 314 U. S., at 505. But the Court held that Congress, rather than adopting this flexible approach, which was applied by the Court of Appeals in the instant case, "undertook to regulate . . . without the necessity, where Congress has not acted, of drawing the precise line between state and federal power by the litigation of particular cases." *Id.*, at 506–507. What Congress did was to adopt the test developed in the *Attleboro* line which denied state power to regulate a sale "at wholesale to local distributing companies" and allowed state regulation of a sale at "local retail rates to ultimate consumers." 314 U. S., at 504.

This conclusion has been consistently reaffirmed in subsequent cases. In *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n,* 332 U. S. 507, which considered the reach of § 1 (b) of the Natural Gas Act, the Court said that "the line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No ex-

ceptions were made in either category for particular uses, quantities or otherwise." 332 U. S., at 517. In *United States* v. *Public Utilities Comm'n of California,* 345 U. S. 295, the Court said that "Congress interpreted that case [*Attleboro*] as prohibiting state control of wholesale rates in interstate commerce for resale, and so armed the Federal Power Commission with precisely that power," 345 U. S., at 308, and further that "Part II [of the Power Act] is a direct result of *Attleboro.* They are to be read together. The latter left no power in the states to regulate licensees' sales for resale in interstate commerce, while the former established federal jurisdiction over such sales." 345 U. S., at 311.

Plainly, the Court of Appeals' reading of the § 201 (a) proviso as requiring an appraisal in each case of the impact of the particular sale, is inconsistent with these decisions. Section 201 (b) embodies a clear grant of power, and we have held that § 201 (a) was merely a "policy declaration . . . of great generality. It cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose." *Connecticut Light & Power Co.* v. *Federal Power Comm'n,* 324 U. S., at 527. We reiterated this view in *United States* v. *Public Utilities Comm'n, supra,* 345 U. S., at 311, where we also said, "to conceive of it [§ 201 (a)] now as a bench mark of the Commission's power, or an affirmation of state authority over any interstate sales for resale, would be to speculate about a congressional purpose for which there is no support." In short, our decisions have squarely rejected the view of the Court of Appeals that the scope of FPC jurisdiction over interstate sales of gas or electricity at wholesale is to be determined by a case-by-case analysis of the impact of state regulation upon the national interest. Rather, Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making

unnecessary such case-by-case analysis. This was done in the Power Act by making FPC jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States. There is no such exception covering the Edison-Colton sale.[9]

The PUC and Edison would alternatively find a congressional exemption in the asserted fact that Congress has exempted from FPC regulation all sales of energy generated at Hoover Dam. Section 6 of the Boulder Canyon Project Act, 45 Stat. 1061, 43 U. S. C. § 617e, grants the Secretary of the Interior "control of rates and service in the absence of State regulation or interstate agreement" and provides that "he shall also conform with other provisions of the Federal Water Power Act and of the rules and regulations of the Federal Power Commission, which have been devised or which may be hereafter devised, for the protection of the investor and consumer." The FPC reversed the Hearing Examiner's ruling that § 6 was an exclusive grant to the Secretary of regulatory power over Hoover energy, and held that "what authority to regulate rates that is here granted to the Secretary of the Interior is authority that would be subject to the later enactment of the Federal Power Act in 1935 containing a comprehensive scheme for the regulation of sales at wholesale in interstate commerce (Section 201 (b))." 26 F. P. C., at 227. The Court of Appeals did not decide the question but assumed that it was properly determined in favor of FPC and Colton. 310 F. 2d, at 786, n. 2.

---

[9] In 1954 Congress amended the jurisdictional provision of the Natural Gas Act to exempt persons receiving natural gas within a State and transmitting or selling it for consumption solely within the same State. 68 Stat. 36, 15 U. S. C. § 717 (c). A proposal which would have similarly limited FPC jurisdiction in the electric power field died in Committee. See Hearings before House Subcommittee of the Committee on Interstate and Foreign Commerce on H. R. 2972 and 2973, 80th Cong., 1st Sess.

We think that the reasoning underlying our decisions in *United States* v. *Public Utilities Comm'n, supra,* and *Pennsylvania Water & Power Co.* v. *Federal Power Comm'n,* 343 U. S. 414, is directly applicable here, and requires a decision upholding FPC jurisdiction. Those cases involved the question whether FPC jurisdiction under § 201 (b) was precluded by a provision of the 1920 Water Power Act which is similar to § 6. The Water Power Act became Part I of the Federal Power Act when Part II was enacted in 1935. Section 20 provided that the rates and services in connection with sales of energy generated at hydroelectric projects licensed under that Act were to be regulated by the FPC whenever "any of the States directly concerned has not provided a commission or other authority to enforce the requirements of this section within such State . . . or such States are unable to agree through their properly constituted authorities on the services . . . or on the rates . . . ." In *United States* v. *Public Utilities Comm'n, supra,* the PUC asserted jurisdiction over rates of a company licensed under Part I of the Federal Power Act. The FPC ordered the licensee to show cause why the rates were not subject to exclusive federal jurisdiction. The PUC argued that § 201 (b) was inapplicable, relying upon the concluding words of § 201 (a), and contending that since § 20 contained an affirmative grant of power to the States, FPC regulation was precluded. This Court held that there is no evidence that Congress intended to give the states what was essentially national power, for that question was not determined until *Attleboro,* and:

> "The sweep of the statute [201 (b)] is wholly inconsistent with any asserted state power as fixed by § 20 of the 1920 Act. We have examined the legislative history [of § 201 (b)]; its purport is quite clear. . . . There is nothing to indicate that Congress' conception of the states' disability in 1935, or

of the power it gave the Commission by Part II, did not include Part I electricity. In fact, the unqualified statements concerning Part II favor the opposite construction, for we find the Act explained time and again as empowering the agency with rate authority over interstate wholesale sales for resale; not once is this authority spoken of as one conditioned on the electricity concerned having been produced by steam generators or at nonlicensed dams." 345 U. S., at 307–308.

In the *Pennsylvania Water* case the FPC asserted jurisdiction over the rates charged by a licensee to a Maryland distributor of electric power. In sustaining FPC jurisdiction we rejected the contention that because Pennsylvania Water was a licensee under Part I of the Federal Power Act, and therefore subject to regulation under that Part, its regulation under Part II was precluded. 343 U. S., at 418–419.

We think the power given the Secretary under § 6 of the Boulder Canyon Project Act is similar in scope to the power of the FPC under § 20 of the 1920 Water Power Act. Under the Water Power Act the principal function of the FPC, then composed of the Secretaries of War, Interior, and Agriculture, was the licensing, construction and operation of hydroelectric development projects. Its power to regulate rates was based upon the national power over navigable waters and public lands, and not upon power over interstate commerce. It was exercised only as an incident of the licensing power, and then only to fill a hiatus which might otherwise exist in the absence of state regulation. The legislation rests on the assumption that the FPC would regulate only in the absence of state regulation.

An analysis of § 6 of the Boulder Canyon Project Act compels the same conclusion. The parallel between

the two sections is unmistakable. Licensing by the FPC for the construction of Hoover Dam was unnecessary because Congress itself had authorized the construction. Since general supervisory power was given to the Secretary rather than the Commission, § 6 of the Act gave him powers analogous to those given the FPC by § 20 of the Water Power Act.[10] While the words of § 6 do not precisely track those of § 20, the history of § 6 belies the assertion that it contained an affirmative grant of power to the States. It merely assumed, contrary to *Attleboro*, a breadth of state regulatory power [11] which made unnecessary all but intersticial federal regulation. Although § 6 did not become law until two years after

---

[10] The Secretary of the Interior had then as he has now the duty to fix the rates at which he sells Hoover energy to enable the United States to recoup the costs of building the dam and associated facilities. Boulder Canyon Project Act, Dec. 21, 1928, c. 42, §§ 4 (b), 5, 45 Stat. 1057, 1059, 1060, 43 U. S. C. §§ 617c (b), 617d; Boulder Canyon Project Adjustment Act, July 19, 1940, c. 643, § 1, 54 Stat. 774, 43 U. S. C. § 618. Section 201 (f) of the Federal Power Act exempts the Secretary's sale of energy from FPC jurisdiction but our concern in this case is not with the Secretary's sales to Edison but with Edison's resale to Colton.

[11] As originally introduced, the bill contained no reference to the regulation of resales of Hoover energy. Compare H. R. 6251, 69th Cong., 1st Sess. (1925), with H. R. 5773, 70th Cong., 1st Sess. (1927). The Secretary of the Federal Power Commission presented his views in letter form to the Senate Committee on Irrigation, and warned that "there is no requirement that any Federal agency shall, in absence of State regulation or of interstate agreement, have any jurisdiction to regulate rates, services, or security issues of lessees, whether the power developed be or be not transmitted in interstate commerce." See Hearings before the Senate Committee on Irrigation and Reclamation on S. Res. No. 320, 69th Cong., 1st Sess., pt. 6, at 893 (1925).

The present form of § 6 is generally conceded to be the result of this letter, and it is thus apparent that, far from being an affirmative grant of power to the States, that section only referred to state power as a means of defining the contingency upon which federal power would be asserted.

*Attleboro* was decided, that section was in the legislation proposed two years earlier, and it does not appear from the legislative history of § 6 that the attention of Congress was ever directed to the significance of that decision upon the effectiveness of the section.[12]

On the other hand, the legislative history of Part II of the Power Act demonstrates that Congress believed that *Attleboro* and the related cases compelled it to forego its assumption as to state regulation and displace it with comprehensive federal regulation. A proper concern for this objective requires the conclusion that Part II superseded and repealed any regulation under § 6 by the Secretary of the Interior or the States of interstate wholesales of electric energy subsequently made of Hoover power.

The judgment of the Court of Appeals is

*Reversed.*

---

[12] There is no merit in the argument that the failure of Congress expressly to repeal this portion of § 6 when passing the Boulder Canyon Project Adjustment Act in 1940, 54 Stat. 774, as amended, 43 U. S. C. §§ 618–618p, and the Act of May 28, 1954, c. 241, 68 Stat. 143, evinces a congressional intention that the Secretary and not the FPC regulate wholesale rates. The 1940 Act modified the method by which the Secretary was to fix the rates at which he sells Boulder Canyon energy but had no bearing upon the regulation of subsequent sales. See H. R. Rep. No. 2328, 76th Cong., 3d Sess. (1940).