424 A.2d 514

PHILADELPHIA ELECTRIC COMPANY

v.

BOROUGH OF LANSDALE, Appellant.

PHILADELPHIA ELECTRIC COMPANY, Appellant,

v.

BOROUGH OF LANSDALE.

Superior Court of Pennsylvania.

Argued March 20, 1979.

Filed Jan. 5, 1981.

Petition for Allowance of Appeal Denied Aug. 6, 1981.

380

Stephen W. Miller, Philadelphia, for appellant (at No. 1916) and for appellee (at No. 1918).

John R. McConnell, Philadelphia, for appellant (at No. 1918) and for appellee (at No. 1916).

Before CERCONE, President Judge, and WATKINS and HOFFMAN, JJ.

WATKINS, Judge:

This is an appeal from the order of the Court of Common Pleas of Montgomery County, Civil Division, sitting in equity whereby the court below reformed a contract entered between the parties hereto. Both parties have appealed the lower court's adjudication.

Philadelphia Electric Company, hereinafter referred to as Plaintiff, initiated this action in equity in the court below seeking the reformation of a contract entered into with The Borough of Lansdale, the defendant, by which the plaintiff agreed to supply the defendant with electrical power which the defendant would then resell to its customers. The plaintiff claimed that the written contract between the parties did not embody the correct intent of the parties to the agreement with respect to the rate schedule which was attached thereto, alleging that the rate schedule attached to the contract was included as a part thereof in error. The rate schedule in question was a "fixed rate schedule" by which the plaintiff agreed to supply 11,600 kilowatts to 29,000 kilowatts of power per month to the defendant at the rate of 8.6 mills per kilowatt hour. The plaintiff alleged that the true intent of the parties to the agreement was that the plaintiff would be permitted to seek rate increases from

the Federal Power Commission[1] during the term of the contract. In support of its position the plaintiff introduced evidence at the equity trial to the effect that plaintiff's representatives had informed the Borough Council members of Lansdale Borough during negotiations for the contract of plaintiff's intention to apply for rate increases before the Federal Power Commission. Plaintiff also introduced testimony to the effect that defendant's representatives had consistently informed plaintiff that the Borough would oppose any such request. Plaintiff then argues that the contract eventually prepared by the plaintiff and executed by both parties was the product of a mutual mistake, and as such is subject to a decree reforming it so that it expressed the intent of both parties. On June 29, 1977, the court below found for the plaintiff, reformed the contract, and held that the evidence produced at the equity trial demonstrated that it was the parties' intent that the rates were to be increased to 9.2 mills per kilowatt hour. The court en banc dismissed all exceptions to its decree filed by both parties on June 5, 1978. Thereafter the plaintiff appealed the court's order claiming that it was correct in reforming the contract but that there was insufficient evidence produced at the equity trial to enable the court to find that the parties' intended a 9.2 mill per kilowatt hour rate. The defendant also appealed the order claiming that the court below did not have jurisdiction over the matter that the chancellor incorrectly found that the parties' intended anything other than what was provided by the written contract, and raising issues of res judicata, laches, and collateral estoppel.

The defendant, a municipal corporation, had owned and operated an electric system by which it had sold electricity

1. The Federal Power Act, 16 U.S.C. § 24, confers jurisdiction over the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce upon the Federal Power Commission. Since October 1, 1977, subsequent to the initiation and determination of the instant proceedings at the federal level, the F.P.C. ceased to exist and its regulatory functions regarding energy have been assumed by the Federal Energy Regulatory Commission (FERC).

to its residents. In 1964 the defendant entered into a written contract with the plaintiff by which the plaintiff undertook to supply the defendant with additional electricity up to a maximum of 8,000 kilowatts per month at the rate of 8.6 mills per kilowatt hour. Said contract, a fixed rate contract, was filed with the Federal Power Commission as required by law. See *16 U.S.C. § 824(c)*.

In October of 1969 the defendant solicited bids from both the plaintiff and the Pennsylvania Power and Light Company, another electricity supplier and a competitor of the plaintiff. The defendant had solicited proposals for the purchase of electrical energy for its total needs for a five year period from both companies as the defendant had decided to cease producing electricity entirely and to purchase all of its electricity which it would then continue to resell to its residents. Both plaintiff and the Pennsylvania Power and Light Company submitted proposals to the defendant. Although Pennsylvania Power and Light Company's proposals were somewhat lower than the plaintiff's the defendant decided to negotiate with the plaintiff because defendant's costs of renovating its equipment to receive plaintiff's electricity would be substantially less than would be its costs of renovating its equipment to receive Pennsylvania Power and Light Company's electricity. Throughout the negotiations conducted between plaintiff and defendant, the plaintiff made it clear that it intended to seek rate increases from the Federal Power Commission. The defendant made it just as clear to the plaintiff that it would oppose any such requests for rate increases. While negotiations between the parties commenced with Plaintiff's proposal to defendant, submitted in November of 1969, a written contract between the parties was not prepared until October 21, 1971 when plaintiff submitted a written contract to defendant. The defendant then executed the contract on November 12, 1971. (Plaintiff had executed the contract prior to submitting it to defendant). The said contract contained therein a "fixed rate schedule" which did not permit plaintiff to seek rate increases which contract was to be effective

on July 27, 1972. Plaintiff then filed the contract with the Federal Power Commission. However, this filing was rejected by the Federal Power Commission as premature because more than 90 days would expire before it could be implemented. On April 13, 1972, the parties met at a breakfast meeting held at plaintiff's request. For the first time since the negotiations began plaintiff had legal counsel present at the meeting. The alleged purpose of the meeting was to discuss plaintiff's demand for increased rates. Once again defendant's representatives indicated their opposition to any proposed rate increase but did not cite the "Sierra-Mobile" doctrine nor any specific reason for their opposition to the rate hike proposal. On May 1, 1972, the plaintiff filed the November 12, 1971 contract with the Federal Power Commission and simultaneously requested a rate increase therefrom amounting to an increase of 34.8%.

On June 6, 1972, defendant filed an opposition to the rate increase requested by plaintiff and cited the November 12, 1971 contract's rate schedule as grounds for its opposition. In *FPC v. Sierra Pacific Power Company*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) and *United Gas Pipeline Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), hereinafter referred to as the "Sierra-Mobile" Doctrine, the United States Supreme Court held that the Federal Power Commission could not grant unilateral filings for rate increases which were at variance with fixed rate contracts. On August 31, 1972, the Federal Power Commission rejected plaintiff's request for a rate increase. Plaintiff then appealed the matter to the United States Court of Appeals for the District of Columbia. After a hearing, the court held that the contract between the parties was a fixed rate contract which did not provide for unilateral filings for rate increases, ordered the contract to be filed, and provided that the Federal Power Commission might conduct hearings to determine whether the rates were so low as to contravene the public interest pursuant to Section 206(a) of The Federal Power Act. *Borough of Lansdale, Pennsylvania v. Philadelphia Electric Company*, 494 F.2d

1104 (D.C. Cir. 1974).[2] Hearings were held by the Federal Power Commission at which plaintiff argued: (1) that rates set forth in the November 12, 1971 contract were so low as to adversely affect the public interest; and (2) that the said contract which the court had ordered plaintiff to file was invalid by reason of mutual mistake. On April 6, 1977, the Federal Power Commission issued its "Opinion and Order" on the matter in which it discussed and rejected both of plaintiff's arguments. Plaintiff then requested and obtained a re-hearing on the matter. On June 1, 1977 the Federal Power Commission issued a second opinion which found that plaintiff had presented no new evidence or arguments justifying a result any different than the decision made on April 6, 1977 and therefore it reaffirmed the April 6, 1977 decision "in all respects".

On July 3, 1974 plaintiff filed a Complaint in Equity in the Court of Common Pleas of Montgomery County seeking a reformation of the contract language. At the equity trial plaintiff produced evidence designed to prove that neither party to the November 12, 1971 contract had actually contemplated a "fixed rate" fee schedule as part of the contract and that, therefore, the contract was a product of mutual mistake and, as such, should be reformed to express the true intent of the parties thereto. In support of its position the plaintiff produced testimony to the effect that throughout the negotiations plaintiff's representatives to the Borough of Lansdale had consistently made it clear that plaintiff intended to approach the Federal Power Commission with regard to rate increases for the plaintiff. Plaintiff also cited the fact that at the April 13, 1972 breakfast meeting between representatives of the plaintiff and the defendant that defendant's representatives never mentioned the "Sierra-Mobile" doctrine as a basis for their opposition to plaintiff's proposed rate increase requests. Plaintiff also produced testimony that it lost money on the contract. While eventually accepting plaintiff's argument that the contract should be reformed, the court below noted in its opinion that

2. *16 U.S.C. § 824e(a).*

merely because the plaintiff could not make a profit on the contract did not necessitate a finding of mutual mistake. The court discussed the possibility that the plaintiff may have attempted to induce the defendant to contract with plaintiff for its power at low initial rates knowing full well that once the defendant incurred the expense of renovating its facilities to accept plaintiff's electricity and began receiving power from plaintiff that it would then lose its bargaining position for future contracts as it would be dependent on plaintiff for its power needs. As stated by the court below:

"Particularly when a competitive factor was involved . . . would the larger utility be willing to make various concessions and enter into a short-term bargain which would be considered an unfavorable one for the large utility. This, because at the expiration of the contract period; and, following the practical abdication by the municipal utility of its power generation business; the larger utility is pretty much in the driver's seat."

The court also felt that the April 13, 1972 breakfast meeting conducted at plaintiff's request was an attempt by plaintiff to "make a case" after it had discovered that there would be problems with the proposed rate increases pursuant to the terms of the contract. Of course, merely because the defendant's representatives did not mention the "Sierra-Mobile" doctrine by name at this meeting does not conclusively establish that they were unaware of the contract's "fixed rate" nature as plaintiff would have us believe. Nor are we totally convinced that merely because plaintiff's representatives consistently discussed proposed rate increases throughout the contract negotiations with defendant that defendant did not intend to enter into that contract that it did. It is at least plausible to believe that in light of defendant's opposition to rate increases and with plaintiff facing a competitive situation the defendant believed, when it received the contract on October 21, 1971 from the plaintiff, that plaintiff had given up its intention to seek rate increases and was, in effect, acceding to the defendant's demands of no rate increases.

There is also certain evidence tending to negate plaintiff's assertion that *it* was unaware of the "fixed rate" nature of the contract. When plaintiff attempted to file the contract on December 27, 1971, plaintiff pointed out to the commission that the rate schedule contained in the new contract had not changed from the 1964 contract. There is also evidence that plaintiff drafted a similar contract with Conowingo Power Company at the same time it entered into the contract with the defendant. The Conowingo contract contained a provision permitting plaintiff to seek rate increases from the Federal Power Commission, thereby casting doubt on plaintiff's claim that the instant contract was a mistake caused by its inexperience in drafting contracts which concerned Federal Power Commission filings.

■ A contract may be reformed where a mutual mistaken belief, shared by the parties with respect to a material aspect of the agreement, prevents it from conforming to the true intention of the parties. *General Electric Credit Corporation v. Aetna Casualty & Surety Company*, 437 Pa. 463, 263 A.2d 448 (1970). Under this doctrine, of course, plaintiff must prove that both plaintiff and defendant believed that the intent of both parties was that the plaintiff was to be allowed to seek rate increases. However, if defendant, when it executed the contract, believed that plaintiff intended a "fixed rate contract" when plaintiff submitted the contract to the defendant, then there is no mutual mistake but merely a unilateral mistake on plaintiff's part. The court below found that plaintiff's evidence did prove a mutual mistake. We are merely pointing out that plaintiff's evidence does not lead unerringly to that conclusion.

As stated above, defendant alleges that the court below did not have subject matter jurisdiction over the issue at hand and also contends that plaintiff's action in equity is barred by the principles of res judicata, laches, collateral estoppel, and mootness. Specifically the defendant claims that *16 U.S.C. § 824(b), Section 201(b)* of the Federal Power Act confers plenary jurisdiction over all wholesale power sales in interstate commerce upon the Federal Power Com-

mission except where Congress has made such sales explicitly subject to regulation by the States, citing *F.P.C. v. Southern California Edison Company,* 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). Thus, the defendant argues that the matter at hand is exclusively within the jurisdiction of the Federal Power Commission. The defendant also argues that the principles of collateral estoppel and res judicata bar plaintiff's cause of action claiming that the issues raised by the plaintiff in this proceeding have already been decided in defendant's favor at the federal level, a forum initially chosen by the plaintiff, when it filed for the rate increases before the Federal Power Commission prior to seeking a reformation of the contract in the court of equity. The defendant also claims that plaintiff was guilty of laches in failing to institute the equity action until July of 1974 when it realized that it had a problem with the contract as early as April of 1972. The defendant claims that it has been severely prejudiced by the delay because the defendant spent over $350,000 on new equipment in order to receive and transmit plaintiff's electricity, closed down its own electrical generating facilities and dismantled its plant thereby precluding itself from generating its own power, irrevocably committed itself to receiving plaintiff's electricity rather than Pennsylvania Power and Light Company's, and incurred great legal costs in litigating the matter at the federal level. The defendant's mootness argument is based upon the fact that only the Federal Power Commission (now Federal Energy Regulatory Commission) has the authority to set rates and that therefore it argues that the court below had no way of effectuating any decision it made and was thus deprived of fashioning any remedy, whatever its decision.

The plaintiff argues that the court below did have jurisdiction over the matter because it involved an interpretation of a contract under Pennsylvania contract law and also argues that the doctrine of res judicata and collateral estoppel do not apply to the instant case because the Federal Power Commission never considered the issue of whether

the contract was the result of a mutual mistake but decided only that the contract was not ambiguous as to the provisions regarding rates and that the rates were not so low as to adversely affect the public interest. Thus, the plaintiff argues, the matter of mutual mistake was never heard on the merits at the federal level.

██ "When a court of competent jurisdiction has determined a litigated case on its merits, the judgment entered, until reversed, is, forever, and under all circumstances, final and conclusive as between the parties to the suit... in respect to every fact which might properly be considered in reaching a judicial determination of the controversy, and in respect to all points of law there adjudged, as those points relate directly to the cause of action in litigation and affect the fund or other [matter] before the court." *Bearoff v. Bearoff Brothers, Inc.*, 458 Pa. 494, 327 A.2d 72 (1974). For the doctrine of res judicata to be applicable it is necessary that there be: (1) identity of issues; (2) identity of causes of action; (3) identity of persons and parties to the action; and (4) identity of the quality or capacity of the parties suing or sued. *Safeguard Mutual Ins. Co. v. Williams*, 463 Pa. 567, 345 A.2d 664 (1975). The issue in the instant case therefore is whether, the question of mutual mistake was resolved at the federal level. A careful reading of the Opinion and Order of the Federal Power Commission dated April 6, 1977 and made a part of the record in the instant case reveals that this issue was indeed raised, argued, and decided adversely to the plaintiff during the Federal Power Commission's proceedings. See *Opinion No. 791, Docket Nos. E–7795, E–7989, Opinion and Order by the Federal Power Commission* dated April 6, 1977. We quote at length from that opinion:

"In acting pursuant to court instructions, however, the Commission did not hear Philadelphia's argument, based upon contract law, that the fixed-rate contract, which was ordered to be filed and that was made effective, was invalid by reason of mutual mistake—a defense which, if substantiated, would negate the contract itself. Because

this argument was not addressed on its merits by the Commission at that time, Philadelphia raised the question in the instant proceeding. Lansdale objects to the interjection of this issue in the Section 206(a) proceeding as a collateral attack upon both the Commission's order effectuating the fixed rates imposed by the contract and the *Lansdale* decision. However, because the question was not before either the Commission or the court, we find that the question is not *res judicata* and, furthermore, is properly addressed in the instant proceeding.

". . . In ordinary circumstances the Commission is bound under the law of contracts to construe the contractual intent of the parties as it is expressed in their written agreement. Accordingly, parol evidence will not be considered in an attempt to alter the plain and unambiguous intent apparent on the fact of the subject agreement. See, *Appalachian Power Company v. FPC*, 529 F.2d 342, 348 (D.C.Cir.1976). However, the thrust of Philadelphia's argument in this case is that *'despite the language in the contract* the parties never intended to create a fixed rate agreement, but in fact negotiated on the mutual assumption that a rate increase could and would be filed by Philadelphia.' *Philadelphia Br. Opp.*, pg. 7 (emphasis supplied). While the Commission cannot simply ignore the filed contract which supplies the focus of this proceeding in favor of private characterizations of this contract, colorable arguments challenging the contract itself are properly entertained in an investigation under Section 206(a). See, *Sam Rayburn Dam Electric Corporation v. FPC*, 515 F.2d 998 (D.C.Cir.1975). Thus, to the extent that Philadelphia now argues only that its contractual intent was different from the unambiguous expression of that intent in the governing instrument, its position on exceptions is untenable. But it is apparent that Philadelphia's position goes beyond a mere recharacterization of the contractual language to raise a substantive question whether a valid contract was, in fact, propounded under the state contract law. This latter claim—in the nature of an affirmative defense—represents a threshold question which, if re-

solved in favor of Philadelphia's position, would be disposi-
tive of the *Sierra* question as to Lansdale's prospective
entitlement to the contract rate.

"... Since we find also that Philadelphia's allegation of
mutual mistake[9] is properly cognizable in the instant
Section 206(a) proceeding, it follows that relevant evi-
dence on this issue was properly admitted, the stated
grounds relied upon by the Presiding Judge to the con-
trary notwithstanding Lansdale's procedural exception,
therefore, is without merit.

---

[9] The Presiding Judge apparently felt bound by the Commission's
language in its August 31, 1972 order which indicated that evidence
outside the four corners of the contract would not be considered.
'Order Rejecting Proposed Rate Agreement,' *Philadelphia Electric
Co.*, et al., Docket No. E7726, August 31, 1972. This order, however,
was vacated by the court in *Borough of Lansdale*, supra, 494 F.2d at
1117, and is of no binding force in the instant investigation. Never-
theless, in the aforementioned order the Commission only held that
'there is no ambiguity in Philadelphia's contract ... [and therefore]
... no need to consider the parol evidence advanced by Philadel-
phia...' Order at pg. 4. Obviously, *the only issue addressed in that*
order was the admissibility of parol evidence to explain the intention
behind unambiguous contractual language. Our present considera-
tion of parol evidence is limited to its probative value *in establishing
Philadelphia's allegation of mutual mistake*, an issue not addressed
in the August 31, 1972 order. (emphasis ours)

"Recent judicial precedent recognizes that this Commis-
sion must necessarily construe the contractual intent of
the parties to sales of electric power in interstate com-
merce when a unilateral rate filing is challenged as incon-
sistent with the governing instrument.

"In deciding *whether to accept a filing* of a rate in-
crease made unilaterally by the seller the Commission
must decide whether the parties intended *to allow such*
unilateral changes or whether the contract established a
fixed rate negotiation. *(Gulf States Utilities Co. v. FPC*,
518 F.2d 450, 452 (D.C. Cir. 1975), (emphasis supplied).
"... Philadelphia has failed to prove that there was a
material mutual mistake with respect to the governing
rate—such rate being obviously a *sine qua non* of the
agreement—*and, upon the merits, we find that the compa-
ny has failed to substantiate its legal contention.* (empha-
sis-ours)"

 Thus, it appears that the issue of mutual mistake was addressed at the federal level and that the Federal Power Commission decided this issue adversely to plaintiff.

Plaintiff further argues, however, than an administrative decision has no res judicata effect upon a subsequent action to determine an issue not within the jurisdiction of the administrative agency. The plaintiff argues that the Federal Power Commission did not have jurisdiction over the issue of whether a mutual mistake had occurred. However, the application of res judicata principles is not precluded merely because administrative proceedings are involved and where an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate the courts will not hesitate to apply res judicata principles. *U. S. v. Utah Construction and Mining Company,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). A review of the proceedings before the Federal Power Commission reveals that initially that agency would not permit parol evidence of mutual mistake to be introduced before it. Were matters concluded at that point we would feel compelled to exercise jurisdiction over the issue of mutual mistake for that issue would never have been addressed and Pennsylvania law does recognize the principle of mutual mistake under our law on contracts. However, in further proceedings before the Federal Power Commission, the plaintiff was permitted to introduce parol evidence relative to its allegation of mutual mistake and the issue was addressed by the Federal Power Commission, although not to plaintiff's satisfaction. The sole issue, therefore, is whether the issue of mutual mistake was *properly* raised before the Federal Power Commission. We find that it was. As set forth above the Federal Power Commission found that... "this Commission must necessarily construe the contractual intent of the parties to sales of electric power in interstate commerce when a unilateral rate filing is challenged as inconsistent with the governing instrument". Citing *Gulf States Utilities Co. v. FPC,* 518 F.2d 450 (D.C. Cir. 1975). Thus, it is clear that: (1) the issue of

mutual mistake has been raised and argued at the federal level before the Federal Power Commission; (2) that it was the plaintiff which chose to submit and argue that issue before the Federal Power Commission; (3) that in dealing with that issue the Federal Power Commission recognized that there is no federal contract law, as such and applied principles of Pennsylvania contract law to the dispute; and (4) that the plaintiff is now arguing that the Federal Power Commission was not competent to decide that issue, and (5) that the plaintiff has taken no appeal to the federal courts regarding the issue.

 What is also clear is that the Federal Power Act grants to the Federal Power Commission jurisdiction of all sales of electric energy at wholesale in interstate commerce not expressly exempted by the Act. *FPC v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964). It is clear, therefore, that we do not have the authority to determine the rates to be paid by the defendant to the plaintiff for its electrical power. Only the Federal Power Commission may do that and in the instant case the Federal Power Commission has already heard plaintiff's arguments regarding mutual mistake and has rejected them thereby establishing the rates as those set forth in the rate schedule of the contract. Were we to decide that a mutual mistake had indeed occurred, as plaintiff requests us to do, plaintiff presumably would then apply to the Federal Power Commission for a retroactive rate increase. But the Federal Power Commission has already heard all of plaintiff's arguments with regard to this matter and has rejected them.[3]

 Thus, even were we to rule that a mutual mistake had occurred (and for various reasons appearing on the record we are not convinced that that was the situation as discussed above) any reformation of the contract would merely alter

3. The court below may have recognized the inherent problem with regard to effectuating its order and thus attempted to fix a specific rate in its decision which plaintiff appealed claiming that the court below did not have sufficient evidence before it justifying the setting of the specific rate.

the "fixed rate schedule" to a rate schedule permitting the plaintiff to seek rate increases from the Federal Power Commission which rate increase requests have already been rejected by the Federal Power Commission. Under these circumstances it would be unwise and futile for us to exercise jurisdiction over this matter. Because the Federal Power Commission has the sole regulatory authority to fix rates in matters involving wholesale sale of electricity in interstate commerce and because the Federal Power Commission has already considered and decided plaintiff's mutual mistake arguments we hold that the doctrines of res judicata and collateral estoppel apply to the instant case since the identity of the issue, causes of action, persons and parties to the action and quality or capacity of the parties suing or being sued are the same here as they were before the Federal Power Commission. Had the Federal Power Commission persisted in its refusal to hear plaintiff's arguments relative to the mutual mistake theory our decision would be different for in that event plaintiff would have been effectively deprived of its "day in court" with respect to that issue which concerns a recognized principle of Pennsylvania contract law. But the Federal Power Commission did hear and decide the issue and in doing so applied principles of Pennsylvania contract law to the issue. As discussed above it is abundantly clear that the federal courts have recognized the Federal Power Commission's rights to hear evidence of, and decide issues relative to, the intent of the parties' to rate arguments. See, *Sam Rayburn Dam Electric Coop. v. FPC*, 515 F.2d 998 (D.C.Cir.1975); *City of Cleveland v. FPC*, 525 F.2d 845 (D.C.Cir.1976). In *City of Cleveland*, the Court stated that, "it is clear enough that a rate schedule, though previously accepted by the Commission [F.P.C.] for filing, is not unalterable when corrections are clearly in order". When the Federal Power Commission conducted its hearing it sat in a judicial capacity. Throughout the proceedings both parties were permitted to present testimony, to cross examine witnesses, and to argue the merits of their respective positions. In rendering its decisions, the Federal Power Commission wrote detailed rea-

soned opinions. In light of *City of Cleveland, Gulf States Utilities,* and *Sam Rayburn Dam Electric Coop.,* supra, it is clear that the Federal Power Commission, in determining rates, has the authority to inquire into the intent of the parties. In light of the above, we hold that the Federal Power Commission was competent to decide the issue of mutual mistake. It has the expertise to decide rate cases, conducts its proceedings in a "judicial manner" affording each party the right to be heard, renders reasoned opinions in reaching its decisions, and has demonstrated the ability and willingness to apply recognized principles of state contract law to disputes involving the intent of the parties' to an agreement coming within its jurisdiction. In addition, the federal courts have recognized its competence in deciding matters involving the parties' intent as previously discussed. Therefore, we see no justification for refusing to recognize the Federal Power Commission's competence in such matters and, as such, find that the Federal Power Commission is competent to decide issues involving contract disputes over the parties' intentions. Thus, we hold that because the issue of mutual mistake has already been determined adversely to the plaintiff by a competent administrative agency acting in a judicial capacity upon a matter clearly within its jurisdiction that the principles of res judicata and collateral estoppel apply to the instant action and that the court below erred in reforming the contract.

■ One other issue needs to be addressed. Plaintiff further claims that even though the Federal Power Commission may have been competent to render a judicial determination of the issue and even though it had already determined the issue of mutual mistake adversely to the plaintiff that its decision with regard thereto is not as res judicata because the Federal Power Commission merely ruled that the contract was not a nullity by reason of its failure to express the agreed upon procedure for future rates changes. This argument has no merit. A review of the Federal Power Commission's Opinion 791 indicates that the Federal Power Commission ruled quite specifically that: "Philadel-

phia (P.E.) has failed to prove that there was a material mutual mistake with respect to the governing rate". . . *"and upon the merits,* we find that the company has failed to substantiate its legal conclusion." (emphasis-ours). It also stated that: "Even though representatives of the company may have repeatedly and orally indicated *their* intention to seek a rate increase at a point in the future, it is simply implausible that the company actually believed that the written agreement protected the company's right to do so in a certain manner. On the contrary, the repeated oral admonitions of the company's representatives raised the contrary inference that these parties *knew* that the executed agreement did not protect the company's power to seek unilateral change of rates."

Worse yet for the plaintiff is the fact that it was the plaintiff who drafted the original agreement, it was the plaintiff who initially chose the forum of the Federal Power Commission for resolution of this matter, and it was the plaintiff who submitted its theory of mutual mistake to the Federal Power Commission. Now plaintiff comes up with a new variation of its mutual mistake theme which it attempts to play here claiming that we should disregard the prior Federal Power Commission decision because it decided the mutual mistake issue on different grounds that the plaintiff raises here. First of all it appears to us that the Federal Power Commission did decide the mutual mistake theory on the merits and found that no mutual mistake had occurred. Secondly, under equitable principles of law we will not permit a party to simultaneously pursue a cause of action in two forums at the same time upon the same theory but with slightly different variations and then, when one forum rules against him, ignore the ruling of that forum, and permit the plaintiff to "play the same tune again" in the second forum with one or two variations. In short, plaintiff chose the Federal Power Commission as the forum in which it would present its mutual mistake argument, the Federal Power Commission was a competent forum for such an argument, and since jurisdiction in rate-making matters in instances

such as these lies with the Federal Power Commission we hold that the principles of res judicata and collateral estoppel bar the plaintiff from raising the mutual mistake issue again in our courts.

Order reversed and plaintiff's complaint in equity dismissed. Judgment for the defendant.