**MIDDLE SOUTH ENERGY, INC., Plaintiff,**

**Arkansas Power & Light Company, Plaintiff-Intervenor,**

**v.**

**ARKANSAS PUBLIC SERVICE COMMISSION; Robert E. Johnson, Commissioner; Patricia S. Qualls, Commissioner; and James W. Daniel, Commissioner, Defendants,**

**Attorney General of Arkansas, Defendant-Intervenor,**

**Ratepayers Fight Back, Defendant-Intervenor.**

**No. LR–C–84–778.**

United States District Court, E.D. Arkansas, W.D.

Sept. 14, 1984.

Michael Thompson, Little Rock, Ark., for Middle South Energy, Inc.

Jerry Jackson, Little Rock, Ark., for Ark. Power & Light Co.

Robert Waldrum and Larry Jegley, Little Rock, Ark., for Ark. Public Service Com'n.

Jay Youngdahl, Little Rock, Ark., for Ratepayers Fight Back.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

The complaint was filed in the above-styled action on August 31, 1984 seeking issuance of an injunction which would prevent the Arkansas Public Service Commission from conducting further proceedings in Docket No. 84–190–U. A hearing on requested temporary relief was heard together with a hearing on the merits (at the suggestion of the Arkansas Public Service Commission and by agreement of the parties) on September 7, 1984. Although all parties were given the opportunity to present evidence, Middle South Energy, Inc. was the only party that called a witness. Extensive briefs have been filed by all concerned, and the Court is now prepared to enter its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The Middle South System consists of a parent holding company, Middle South Utilities, Inc. ("MSU") and various subsidiary companies wholly-owned by MSU. MSU is a holding company registered under the Public Utility Holding Company Act of 1935. MSU's subsidiaries include, among others, four operating companies, Arkansas Power & Light Company ("AP & L"), Louisiana Power & Light Company ("LP & L"), Mississippi Power & Light Company ("MP & L"), and New Orleans Public Service, Inc. ("NOPSI") (collectively the "System Companies"), a generating company, Middle South Energy, Inc. ("MSE"), and a service company, Middle South Services, Inc. ("MSS").

2. The System Companies pool their power. Their systems are interconnected. They coordinate their plans to achieve economies of scale in the construction of new generating plants and by timing construction of units to achieve desirable levels of system reserves. These companies buy power from each other on a more or less regular basis.

3. In early 1974, MSE was created to finance, construct and operate new base load generating projects to provide electric power and energy to the System Companies. The first such project was a nuclear-powered generating plant known as the Grand Gulf Project (the "Project"). In connection with its initial financing MSE obtained from these companies their agreement to purchase power from the Project, provided MSE would build it and make power from the Project available to these companies.

Under this agreement (the "Availability Agreement," PX 1–A), the System Companies agreed, in consideration of MSE's undertaking to build the Project, to pay MSE, beginning on specified dates, whether or not the two units of the Project were then operating, such amounts in addition to funds received from any other source by MSE, as would enable MSE to meet its operating expenses, including interest on debt and depreciation of its investment in the plant at a specified rate. Any payments to be made thereunder by the System Companies would reduce the cost of their future power purchases.

4. The Availability Agreement initially provided that the share of power taken by each System Company from the Project would have varied from time to time relative to the respective needs of each System Company. (PX 1–A) In 1981 the Availability Agreement was amended (PX 1–C) to fix the allocations of power from the Project to the System Companies in specific percentages rather than the variable allocations contemplated by the original Availability Agreement. These fixed percentages were: AP & L—17.1%, LP & L—26.9%, MP & L—31.3%, and NOPSI—24.7%. In 1980 South Mississippi Electric Power Association, Inc. agreed to acquire 10% of the Project. All percentage allocations herein refer to percentages of MSE's 90% undivided ownership interest.

5. Later in 1981 the System Companies entered into a Reallocation Agreement (PX 1–E) under which the System Companies agreed to purchase power from the Project in the following percentages:

|       | Unit No. 1 | Unit No. 2 |
|-------|-----------|-----------|
| AP&L  | 0         | 0         |
| LP&L  | 38.57     | 26.23     |
| MP&L  | 31.63     | 43.97     |
| NOPSI | 29.80     | 29.80     |

6. Since MSE's rights under the Availability Agreement had been assigned by it to various financial institutions in connection with the financing of the Project, MSE's creditors would not permit MSE to change the specified percentage allocations in the Availability Agreement to conform with the Reallocation Agreement.

7. The Availability Agreement has been essential to the financing of the Project. Pursuant to a series of ten agreements entered into between 1977 and 1984, MSE has assigned its rights in the Availability Agreement to secure indebtedness aggregating in excess of $2.5 billion to finance the construction of the Project.

8. In 1982, Unit No. 1 was nearing completion. Pursuant to the requirements of the revised Availability Agreement, MSE entered into an agreement for the sale of power from the Project. (PX 1–F) This agreement, the Unit Power Sales Agreement ("UPSA"), required each System Company to purchase the shares of power specified in the Reallocation Agreement. AP & L signed the UPSA but, in accordance with the terms of the Reallocation Agreement, did not agree to purchase any power from the Project. The UPSA was filed with the FERC in June of 1982, for approval as a wholesale power sales agreement in Docket No. ER82–616–000. The defendants ("APSC") have intervened in and are actively participating in the FERC proceeding relating to the UPSA.

9. In February of 1984, the FERC Administrative Law Judge ("ALJ") approved, after extensive briefing and oral argument, the cost-of-service rate formula with respect to Unit No. 1 as proposed in the UPSA in most material respects. (PX 2) A decision with respect to Unit No. 2 was deferred pending completion of the unit. In his decision, the ALJ did not accept the original allocation contained in the UPSA

and has determined a different allocation under which the System Companies would be obligated to purchase power from Unit No. 1 in the following proportions:

| AP & L | — | 36% |
|--------|---|-----|
| LP & L | — | 14% |
| MP & L | — | 33% |
| NOPSI | — | 17% |

10. On August 1, 1984, the APSC issued its Order to appear and show cause in Docket No. 84–190–U ("August Order") which directed AP & L to appear and:
to show cause why all contracts and agreements made by it with respect to any obligations to purchase power from or to pay for construction and operation costs of the Grand Gulf Project should not be held to be void *ab initio* as a matter of law. (PX 9)

11. MSE has heavy financing needs at the present time, and over the next few years, to complete Unit No. 1, to refinance maturing long and short term indebtedness and to resume full construction of Unit No. 2. To complete Unit No. 1 MSE must raise approximately $200 million in capital. Debt maturities and sinking fund obligations over the next five years are as follows: 1985, $196.2 million; 1986, $1,738.2 million; 1987, $146.2 million; 1988, $196.2 million; and 1989, $162 million: and MSE's share of Unit No. 2 is presently projected to cost in excess of $3.4 billion ($779 million of which has been invested by MSE in that Unit as of July 31, 1984). (PX 1)

## CONCLUSIONS OF LAW

1. In 1935 Congress passed the Federal Power Act, 16 U.S.C. §§ 824 *et seq.*, vesting FERC (then the FPC) with jurisdiction which extends to:
... the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce. § 201(b)(1)
In enacting the Federal Power Act, Congress intended to vest exclusive jurisdiction in the FERC (formerly FPC) to regulate interstate wholesale utility rates. *FPC v. Southern California Edison Co.*, 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964).

2. In the Federal Power Act, Congress defined electric power transmitted in interstate commerce as power which is "transmitted from a State and consumed at any point outside thereof," [§ 824(c)] and wholesale sale as a sale "to any person for resale" [§ 824(d)]. All matters other than the transmission and wholesale sale of electricity in interstate commerce are left to state regulation [§ 824(a) and (b)].

3. This Circuit has recognized that it is often difficult to draw the distinction between interstate and intrastate power sales. In an integrated system of power production, such as MSU's, this distinction is particularly difficult. *Arkansas Power & Light Company v. Federal Power Commission*, 368 F.2d 376 (8th Cir.1966). In this case the subject agreements are inextricably bound to the wholesale sale of power in interstate commerce, and this court cannot accept the fine line of distinction which defendants seek to draw. The Court of Appeals recently reached a similar conclusion in *State of Minnesota, et al v. Federal Regulatory Commission, et al.*, 734 F.2d 1286 (1984), and this decision compels the conclusion I reach today. *See also, Southwestern Bell Telephone Company v. Arkansas Public Service Commission, et al.*, 738 F.2d 901 (8th Cir.1984).

4. The Availability Agreement and amendments thereto are agreements for the purchase of wholesale power in interstate commerce or are so integrally related to such purchases that they are subject to the exclusive jurisdiction of the FERC. The other documents which the APSC seeks to review and regulate are essential to the interstate wholesale sale of power and therefore are not subject to state jurisdiction.

5. MSE must raise an additional several billion dollars in the next few years to pay construction and financing costs. The ability to raise these funds is dependent on the enforceability of the threatened agreements. If the actions of the APSC are not enjoined, the cost of capital to MSE will be raised to the point that the Project is jeopardized, and the ability of MSE to provide its multi-state wholesale customers with

power will be irreparably impaired. Moreover, such actions make future cooperation among the other states for the benefit of the entire Middle South System a virtual impossibility.

6. Plaintiff and Plaintiff-Intervenor are entitled to a permanent injunction prohibiting the Arkansas Public Service Commission from continuing its proceedings in APSC Docket No. 84–190–U.