**NATIONAL STEEL CORPORATION and Panhandle Eastern Pipe Line Company, Plaintiffs,**

v.

**William E. LONG and Edwyna G. Anderson, Defendants.**

**MICHIGAN CONSOLIDATED GAS COMPANY, a Michigan Corporation, Plaintiff,**

**and**

**State of Michigan, Michigan Public Service Commission, and Michigan Gas Utilities Company, Intervening Plaintiffs,**

v.

**PANHANDLE EASTERN PIPE LINE COMPANY, a Delaware Corporation, Defendant,**

**and**

**National Steel Corporation, Intervening Defendant.**

**Nos. L87–30 CA5, L87–46 CA5.**

United States District Court, W.D. Michigan, S.D.

June 16, 1988.

Douglas H. West and Louis J. Porter, of Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for National Steel Corp.

Carson C. Grunewald and James A. Smith, of Bodman, Longley & Dahling, Detroit, Mich., for Panhandle Eastern Pipe Line Co.

Don L. Keskey and Henry J. Boynton, Asst. Attys. Gen., Lansing, Mich., for State of Mich., and Michigan Public Service Com'n, William E. Long, and Edwyna G. Anderson.

Jeffrey M. Petrash and Joseph A. Fink, of Dickinson, Wright, Moon, Van Dusen & Freeman, Washington, D.C., and Lansing, Mich., for Michigan Consol. Gas Co.

Daniel J. Demlow and Ronald E. Christian, of Honigman, Miller, Schwartz and Cohn, Lansing, Mich., for Michigan Gas Utilities Co.

## OPINION OF THE COURT

BELL, District Judge.

These two consolidated actions present issues regarding the interplay of the regu-

latory authority of the Federal Energy Regulatory Commission and the Michigan Public Service Commission over the interstate transportation and delivery of natural gas. Now before the Court are cross-motions for summary judgment, supported by extensive stipulations of fact. In essence, the motions require the Court to determine whether in this case, the asserted regulatory authority of the Michigan Public Service Commission is precluded by federal law.

## FACTUAL BACKGROUND

The proposed activity which gives rise to this dispute is rather straightforward. National Steel Corporation (National Steel) has arranged for the purchase of natural gas from Union Texas Products Corporation in Oklahoma at facilities that are connected with the interstate transportation system of Panhandle Eastern Pipe Line Company (Panhandle). Panhandle has agreed to transport the gas exclusively through its own lines directly to National Steel's Great Lakes Steel Division in Ecorse and River Rouge, Michigan. This direct delivery will enable National Steel to "bypass" the local distributing company, Michigan Consolidated Gas Company (Michigan Consolidated), which currently transports gas to the Great Lakes plant, purporting to substantial cost-savings.

In order to perform this bypass transportation service, Panhandle applied to the Federal Energy Regulatory Commission (Commission) under § 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), for a certificate of public convenience and necessity, authorizing the proposed transportation and requisite extension of facilities. The certificate was granted on September 10, 1987. This certificate notwithstanding, the Michigan Public Service Commission (MPSC) asserts under Act 69 of Michigan

Public Acts of 1929, M.C.L. § 460.501 *et seq.;* M.S.A. § 22.141 *et seq.,* that the proposed transportation may not proceed until after it has issued its own certificate of public convenience and necessity.[1] Accordingly, the MPSC sought and obtained from this Court a preliminary injunction restraining such transportation pending the Court's final determination whether the MPSC does in fact have jurisdiction to regulate the delivery of natural gas to National Steel. It is to this question which the Court now turns.

## NATURAL GAS ACT

■ The proposed transportation of natural gas is transportation in interstate commerce. "Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." *Maryland v. Louisiana,* 451 U.S. 725, 755, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981). The authority of the individual states to regulate such transportation is fundamentally restricted by the Commerce Clause, U.S. Const. Art. 1, § 8, which empowers Congress to regulate commerce among the several states. In 1938, Congress delegated its authority to regulate interstate transportation of natural gas to the Federal Power Commission by enacting the Natural Gas Act ("Act"), 15 U.S.C. § 717 *et seq.* The Act provides at § 1(b):

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or

1. Section 2 of 1929 P.A. 69 provides:
 No public utility shall hereafter begin the construction or operation of any public utility plant or system thereof nor shall it render any service for the purpose of transacting or carrying on a local business either directly, or indirectly, by serving any other utility or agency so engaged in such local business, in any municipality in this state where any other

utility or agency is then engaged in such local business and rendering the same sort of service, or where such municipality is receiving service of the same sort, until such public utility shall first obtain from the commission a certificate that public convenience and necessity requires or will require such construction, operation, service, or extension. M.C.L. § 460.502, M.S.A. § 22.142.

to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

15 U.S.C. § 717(b). The Act thus conferred upon the Federal Power Commission, predecessor of the Federal Energy Regulatory Commission, power to regulate three things, which the states had been deemed, by virtue of the Commerce Clause, unable to regulate: (1) transportation of natural gas in interstate commerce; (2) sale of natural gas in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale. *Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, (Panhandle/Indiana)* 332 U.S. 507, 516, 68 S.Ct. 190, 194, 92 L.Ed. 128 (1947).

The Act was designed not to encroach upon the states' regulatory authority, but to complement it, establishing a means whereby those aspects of natural gas commerce which had traditionally been deemed beyond the reach of state control, could be federally regulated. *Id.*, 332 U.S. at 517, 68 S.Ct. at 195. The Act thus created a "comprehensive and effective regulatory scheme" * * * * "of co-operative action between federal and state agencies." *Id.*, 332 U.S. at 520, 68 S.Ct. at 197. The pre-existing regulatory power of the states was left intact, undiluted by the Act. *Id.*, 332 U.S. at 518, 68 S.Ct. at 196.

Prior to the Act, the parameters of state authority had been determined through case-by-case interest balancing analysis under the Commerce Clause. *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. 205, 213–216, 84 S.Ct. 644, 650–651, 11 L.Ed.2d 638 (1964). In the Act, Congress obviated the need for such case-by-case analysis, drawing "a bright line easily ascertained, between state and federal jurisdiction." *Id.*, 376 U.S. at 215–216, 84 S.Ct. at 651. While confirming that interstate *transportation* of natural gas is federally regulable, the Act draws a "clear and complete" line between sales for resale, which are subject to federal jurisdiction, and direct sales for consumptive uses, subject to state jurisdiction *Id.*, 376 U.S. at 214–215, 84 S.Ct. at 650–651. In addition,

the Act expressly recognizes that "local distribution" and the facilities used therefor are exempt from federal jurisdiction.

■ Thus, application of the Act's bright line test to determine the bounds of federal and state jurisdiction in this case requires consideration of three elements: (1) the scope of the Commission's jurisdiction over interstate transportation (2) whether the proposed transaction includes a direct retail sale; and (3) whether the proposed transaction includes local distribution.

APPLICATION OF THE BRIGHT LINE

■ (1) *Interstate Transportation.* Panhandle's proposed transportation of natural gas from Oklahoma to Michigan is interstate transportation subject to regulation by the Commission. The Commission's jurisdiction over transportation applies regardless of whether the gas transported is ultimately sold retail or wholesale. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 636, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369 (1972). Moreover, the Commission's transportation jurisdiction extends to the point of delivery and covers the facilities through which the gas is delivered. *Panhandle/Indiana, supra; Federal Power Commission v. East Ohio Gas Co.*, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950); *International Paper Co. v. Federal Power Commission*, 438 F.2d 1349 (2d Cir.1971); *United Gas Pipe Line Co. v. Federal Power Commission*, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966). Hence, that the Commission had authority to pass on and grant Panhandle's application for a certificate of public convenience and necessity is not seriously contested. It remains to be determined whether the MPSC *also* has jurisdiction over some aspect of the proposed transaction.

■ (2) *Direct Retail Sale.* Notwithstanding the Commission's transportation jurisdiction, the Act reserves for the states authority to regulate the actual sales of natural gas directly to consumers. Here, the proposed transaction clearly involves a direct retail sale of natural gas to National Steel for its own consumption. It is just as

clear, however, that the sale takes place not in Michigan, but in Oklahoma. There is no transfer of title in Michigan, but simply the delivery by Panhandle of natural gas which already belongs to National Steel. The MPSC's authority to regulate retail sales would thus appear to provide no basis for its present assertion of jurisdiction.

The Court is urged, however, to look beyond the form of the proposed transaction. In its effect upon local interests, it is argued, the proposed transaction is identical to those which have been held subject to state regulation in *Panhandle/Indiana, supra,* and *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission,* 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951) (*Panhandle/Michigan*). For this reason, the Court is asked to deem the transaction a "de facto sale" in Michigan, which is subject to regulation by the MPSC.

In *Panhandle/Indiana* and *Panhandle/Michigan,* Panhandle sought to transport *and sell* natural gas in interstate commerce directly to industrial end-users. At issue in each case was whether the state in which the gas was received and purchased retained regulatory authority over the transaction even though such regulation would invariably touch upon interstate commerce. In ruling that the states did have power to regulate, the Supreme Court looked to the language of § 1(b) of the Natural Gas Act. Since the subject sales of natural gas were not for resale, but were in the nature of an "other sale" not subject to federal regulation and traditionally regulable by the states; and since the Act was construed as not having usurped or diminished pre-existing state regulatory power, the states were deemed to have continuing authority to regulate the *sales.* Thus, the ruling in each case was tied closely to the language of the Act and the "bright line" established by Congress: sales for resale are subject to federal regulation; sales for consumptive use are subject to state regulation.[2] The *Panhan-*

*dle/Indiana* and *Panhandle/Michigan* decisions do not offer persuasive support for the contention that sufficiently important local interests may justify treatment of a non-sale transaction as a sale so that it fits on one side of the bright line or the other.

In *United Gas Improvement Co. v. Continental Oil Co.,* 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965), lease-sale transactions were deemed to be "sales" of natural gas for purposes of the Act. The Court determined that paying slavish respect to the form of the transactions, while ignoring their economic realities, would permit avoidance of Federal Power Commission jurisdiction and circumvention of the Act's purposes. The court held the Act "would be hamstrung if it were tied down to technical concepts of local law." *Id.,* 381 U.S. at 400, 85 S.Ct. at 1522. None of these three concerns is present here. National Steel and Panhandle do not seek to avoid the Commission's jurisdiction, but have submitted thereto and have obtained the requisite certification. Secondly, as is more fully discussed *infra,* the Court does not believe the purposes of the Act are circumvented through this proposed transaction, for the very reason that it is subject to the Commission's regulation. Finally, this case does not present the potential of emasculating the Act through adherence to technical concepts of local law. At issue here, rather, is a contractual bailment arrangement. Cf. *Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360, 386, n. 55 (5th Cir.1981).

Moreover, the "de facto sale" theory was rejected in *Public Service Electric & Gas Co v. Federal Power Commission,* 371 F.2d 1 (3d Cir.1967), *cert. denied* 389 U.S. 849, 88 S.Ct. 33, 19 L.Ed.2d 119 (1967), under facts very similar to those here presented. Where a natural gas producer hired the services of an interstate pipeline company to transport the producer's gas across state lines for consumption at another facility of the producer, the fact that the

---

**2.** It is true that in both cases, the court buttressed its application of the Act's bright line by discussing the importance of the local interests as justification for finding state authority even if Congress had not so clearly spoken. However, the importance of local interests was not the gravamen of the court's reasoning; the Act's language was.

gas was commingled with gas belonging to the pipeline company was held not to compel the conclusion that a succession of sales had taken place where there was no evidence from which to infer that the parties intended anything other than the bailment of a fungible commodity. *Id.*, 371 F.2d at 4. The Court finds this reasoning persuasive and directly applicable in this case.

Accordingly, the Court declines to construe the proposed transaction as including a direct retail sale by Panhandle to National Steel which is subject to MPSC jurisdiction.

■ *(3) Local Distribution.* It is further contended the Commission's transportation jurisdiction does not limit the MPSC's authority, expressly preserved by § 1(b) of the Act, to regulate local distribution of natural gas and the facilities used therefor. The question posed, then, is whether any aspect of the proposed transaction constitutes "local distribution." Although the Act does not define "local distribution," valuable insight into congressional intent is found in H.R.Rep. No. 709, at p. 3, 75th Cong., 1st Sess. (1937):

> In view of the importance of section 1(b), which states the scope of the act, it seems advisable to comment on certain provisions appearing therein. It will be noted that this subsection of the bill, after affirmatively stating, the matters to which the act is to apply, contains a provision specifying what the act is not to apply to, as follows:
>> "but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."
>
> The quoted words are not actually necessary, as the matters specified therein could not be said fairly to be covered by the language affirmatively stating the jurisdiction of the Commission, but similar language was in previous bills, and, rather than invite the contention, however unfounded, that the elimination of the negative language would broaden the scope of the act the committee has included it in this bill. *That part of the negative declaration stating that the act shall not apply to "the local distribution of natural gas" is surplusage by reason of the fact that distribution is made only to consumers in connection with sales, and since no jurisdiction is given to the Commission to regulate sales to consumers the Commission would have no authority over distribution, whether or not local in character.* (Emphasis added.)

House Report No. 709, thus, strongly suggests Congress understood and intended the "local distribution" exemption to be co-extensive with the "other sale" exemption. That is, neither exemption was deemed to diminish the Commission's authority, because the Commission had, in the first instance, been affirmatively granted jurisdiction only over interstate transportation and sales for resale. In other words, Congress understood "local distribution" as necessarily entailing direct retail sales for consumptive use. According to this construction, unless a transaction includes a direct retail sale, it does not constitute local distribution. Since, as discussed *supra*, Panhandle's proposed transportation of natural gas to National Steel is, to the point of delivery, interstate transportation,[3] and does not include a direct retail sale in Michigan, it is not exempt from the Commission's jurisdiction under the Act's "local distribution" proviso.

The reliability of House Report No. 709 and the soundness of the above conclusion are substantiated by the ruling in *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). In *Louisiana Power &*

---

**3.** The Court attaches, for purposes of identifying the transportation as "interstate" or "intrastate," no significance to the point at which the subject natural gas is transferred from high pressure transmission lines to low pressure lines. This distinction, drawn in *Federal Power Commission v. East Ohio Gas Co., supra,* is of questionable validity, cf. *Panhandle/Indiana, supra,* 322 U.S. at 513, 68 S.Ct. at 193, and offers no instruction as to the meaning of "local distribution" in this case.

*Light,* the court addressed the "other sale" proviso of § 1(b). Based upon House Report No. 709, the court held the proviso "was meant to apply exclusively to *ratesetting,* and in no wise limited the broad base of 'transportation' jurisdiction granted the FPC." *Id.,* 406 U.S. at 640, 92 S.Ct. at 1838.

House Report No. 709 is a no less reliable indicator of congressional intent regarding the scope of the "local distribution" proviso. The proviso was viewed as mere "surplusage." Rather than diminishing the Commission's jurisdiction over interstate transportation and sales for resale in any substantive manner, it merely makes clear that "sales for resale" does not include direct retail sales for consumptive use "whether or not local in character." Thus, applying the § 1(b) "local distribution" proviso in conformance with congressional intent, the Court concludes it provides no basis for MPSC regulation of the proposed transaction.

The Court admits the contention that "local distribution" should be given a broader meaning out of respect for the states' authority to regulate matters of essentially local concern has facial appeal. Indeed, the instant proposed service *may* represent only the first of several similar arrangements for direct delivery of natural gas by Panhandle to other industrial end users in southeastern Michigan. If Panhandle were permitted to expand its direct service in this way, its operation could have a profound impact upon local gas supplies and rate structures.

In *Associated Gas Distributors v. Federal Energy Regulatory Commission,* 824 F.2d 981, 1035–37 (D.C.Cir.1987) the court speculated in dictum that state agencies may have authority to regulate bypass transportation. The speculation is based upon the *Panhandle/Michigan* ruling that states retain authority under the Act to regulate direct *sales* to an industrial end user even though such sales are in interstate commerce. Yet, as indicated *supra,* careful reading of *Panhandle/Michigan* reveals it is based not upon a balancing of state and federal interests, but upon reference to the language of the Act. That is precisely the point. The courts are no longer free to engage in interest balancing to determine the relative parameters of federal and state jurisdiction. In fact, the § 1(b) bright line, "clear and complete," "easily ascertained," was specifically designed to obviate the need for such analysis. *Federal Power Commission v. Southern California Edison Co., supra.* The Court's task, then, consistent with *Panhandle/Michigan,* is to apply the language employed in § 1(b) so as to effectuate congressional intent. This the Court has done.

The Court notes that if Panhandle were permitted to expand its direct service to other industrial end users in southeastern Michigan through various short extensions of interconnect facilities branching off from its interstate pipeline, its operation would begin to resemble the process of "distributing gas among consumers within a particular local community." *Federal Power Commission v. East Ohio Gas Co., supra,* 338 U.S. at 469–70, 70 S.Ct. at 269–70. However, this *potential* sort of "local distribution" is not yet before the Court and, in any event, was clearly not within the contemplation of Congress in 1938 when § 1(b) was enacted. The Court must effectuate the intent of Congress which actually informed the language used in 1938, not the intent which the Court believes Congress might have had were it presented the facts and circumstances now before the Court. Moreover, the Court must construe § 1(b) exceptions to federal jurisdiction strictly. *Interstate Natural Gas Co. v. Federal Power Commission,* 331 U.S. 682, 691, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742 (1946). Again, in concluding that no part of the proposed transaction constitutes local distribution, the Court believes it has been faithful to its task.

In summary, application of the § 1(b) bright line test of jurisdiction indicates the Act expressly confers upon the Commission authority to regulate the proposed interstate transportation of natural gas. The Act, on its face, provides no affirmative basis for regulation by the MPSC under either the "other sale" or "local distribution" provisos. The question remains

whether the MPSC may exercise some residual authority not specifically mentioned in the Act or, on the other hand, whether such authority is preempted by the Commission's transportation jurisdiction under the Act.

## PREEMPTION

It is contended that, prior to the Act, the states were recognized as having authority to regulate the sort of transportation and delivery of gas proposed here. Since the Act did not diminish the states' pre-existing authority, the MPSC is said to be entitled to exercise such authority under 1929 P.A. 69, even though the subject transportation does not involve a direct retail sale or local distribution.

It is unquestionably true that the states retain the regulatory authority they possessed before the Act came into being:

The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation to supplement and reinforce it in the gap created by prior decisions.[13] The Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.

---

[13] In H.Rep. No. 709, 75th Cong., 1st Sess., the Committee on Interstate and Foreign Commerce said of the proposed bill which became the Natural Gas Act: "It confers jurisdiction upon the Federal Power Commission over the transportation of natural gas in interstate commerce, and the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use. The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co. v. Public Service Commission* (1920), 252 U.S. 23 [40 S.Ct. 279, 64 L.Ed. 434].) There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing compa-

nies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See [*State of*] *Missouri v. Kansas* [*Natural*] *Gas Co.* (1924, 265 U.S. 298 [44 S.Ct. 544, 68 L.Ed. 1027], and *Public Service Commission* [*of Rhode Island*] *v. Attleboro Steam and Electric Co.* (1927) 273 U.S. 83 [47 S.Ct. 294, 71 L.Ed. 549].) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act."

*Panhandle/Indiana, supra,* 332 U.S. at 517–18, 68 S.Ct. at 195–96. In this excerpt, the Supreme Court acknowledges that the states had the power, prior to the Act, (i.e., where Congress had not acted contrarily in exercise of its power under the Commerce Clause), to regulate *sales* to consumers. This is the pre-existing state authority which the Act preserved by codifying the bright line, while conjunctively investing the Commission with power to regulate interstate transportation. There is no clear support for the proposition that the state ever had power to regulate direct delivery of gas in interstate commerce—in the absence of a sale. The courts simply were never faced with the sort of transportation arrangement proposed here. To opine that state regulation of Panhandle's proposed transportation would have been deemed an acceptable burden upon interstate commerce would be pure speculation. Such speculation is no longer necessary or appropriate, for Congress in the Act has enumerated not all parameters of state authority, but those forms of state regulation which are acceptable encumbrances upon interstate commerce: regulation of "other sales," "local distribution," and "production or gathering." The unavoidable implication is that other forms of state regulatory interference with interstate transportation are prohibited, for Congress has "occupied the field" by delegating its authority over interstate commerce to the Commission.

 This analysis forms the backdrop for determining whether the Act and the Commission's exercise of regulatory jurisdiction thereunder pre-empts the MPSC's asserted authority. The pre-emption doctrine finds its roots in the Supremacy

Clause, U.S. Const., Art. VI, cl. 2. Federal law is supreme and state law, to the extent it conflicts with federal law, is without effect. Application of the doctrine is a function of congressional intent. In *Louisiana Public Service Commission v. Federal Communications Commission*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed. 2d 369, 381–82 (1986) the court summarized the circumstances under which Congress is deemed to have intended pre-emption as follows:

> Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v. Rath Packing Co.* 430 US 519, 51 L Ed 2d 604, 97 S Ct 1305 (1977), when there is outright or actual conflict between federal and state law, e.g., *Free v. Bland*, 369 US 663, 8 L Ed 2d 180, 82 S Ct 1089 (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 US 132, 10 L Ed 2d [248] 1082, 83 S Ct 1210 (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v Delta Air Lines, Inc.* 463 US 85, 77 L Ed 2d 490, 103 S Ct 2890 (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice v Sante Fe Elevator Corp.* 331 US 218, 91 L Ed 1447, 67 S Ct 1146 (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v Davidowitz*, 312 US 52, 85 L Ed 581, 61 S Ct 399 (1941). Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation. *Fidelity Federal Savings & Loan Assn. v De La Cuesta*, 458 US 141, 73 L Ed 2d 664, 102 S Ct 3014 (1982); *Capital Cities Cable, Inc. v Crisp*, 467 US 691, 81 L Ed 2d 580, 104 S Ct 2694 (1984).

Several of the above examples are significant for present purposes.

First, there is a strong possibility of outright or actual conflict between federal and state law. Dual requirements of public convenience and necessity certification are not necessarily in conflict, but pose a great likelihood of conflict, since the MPSC would evaluate the same effects of the same proposed transportation from a somewhat different perspective than the Commission. The Supreme Court's recent ruling in *Schneidewind v. ANR Pipeline Co.*, 485 U.S. —, — 108 S.Ct. 1145, 1156, 99 L.Ed.2d 316, 331–32 (1988) is instructive in this regard:

> When a state regulation "affect[s] the ability of [FERC] to regulate comprehensively ... the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act" or presents the "prospect of interference with the federal regulatory power," then the state law may be pre-empted even though "collision between the state and federal regulation may not be an inevitable consequence." *Northern Natural Gas Co. v. State Corp. Commission of Kan.*, 372 U.S. at 91–92, 83 S.Ct. 646, 650–51, 9 L.Ed.2d 601.

The *Schneidewind* court went on to hold that although "hypothetical conflicts" will not always demonstrate intent to preempt, "imminent possibility" of conflict evidences complete occupation of a field, which justifies preemption. *Id.* Exercise of the MPSC's asserted authority to regulate aspects of interstate transportation over which the Commission has plenary authority and over which the Commission has in fact exercised jurisdiction would certainly create imminent possibility of conflict.

■ This imminent possibility of conflict is not the only evidence of congressional intent to occupy the field. The very purpose of the Act was to provide for federal regulation of interstate transportation of natural gas, something the states had been unable to regulate. In this respect, Congress, which "has undoubted power to define the distribution of power over interstate commerce," occupied the field. *Panhandle/Indiana, supra*, 332 U.S. at 519, 521, 68 S.Ct. at 196, 197. Congress was "meticulous" in specifying those aspects of

interstate commerce as to which state regulation would be permissible. However, the regulatory power here asserted by the MPSC does not pertain to any of those aspects; it is pure and simple a direct and impermissible burden on interstate transportation.

Furthermore, the asserted exercise of jurisdiction by the MPSC, if permitted, would certainly "stand as an obstacle to the accomplishment and execution of the full objectives of Congress." In the Act, Congress sought to establish a scheme of comprehensive, complementary and cooperative action between federal and state agencies. *Panhandle/Indiana, supra,* 332 U.S. at 520, 68 S.Ct. at 197. To make exercise of the transportation authority granted Panhandle by the Commission contingent upon MPSC certification would be to severely undermine the Commission in discharging its duty to regulate interstate transportation comprehensively and uniformly. To permit the MPSC to make its own determination of public convenience and necessity, potentially revoking the Commission's determination thereof would be to stultify the complementary, cooperative roles envisioned by Congress. This result must be avoided. Cf. *Northern Natural Gas Co. v. State Corporation Commission of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963); *First Iowa Hydro–Electric Cooperative v. Federal Power Commission,* 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946); *Public Service Commission of West Virginia v. Federal Power Commission,* 437 F.2d 1234, 1238–39 (4th Cir.1971).

For the same reasons, the Court rejects the notion of concurrent jurisdiction. Even those cases cited in support of concurrent jurisdiction recognize it is inappropriate where state regulation would materially affect interstate commerce in an area; (1) where uniformity of regulation is necessary, *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 444, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960), and (2) where state regulation would impair federal superintendence of the field, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

Accordingly, the Court concludes enforcement of 1929 P.A. 69, M.C.L. § 460.501 *et seq.,* M.S.A. § 22.141 *et seq.* by the MPSC with respect to Panhandle's proposed bypass transportation is pre-empted by the Act. The preliminary injunction issued by this Court must be set aside and Panhandle must be permitted to exercise the transportation authority granted it by the Commission.

## CONCLUSION

The Court is not oblivious to the substantial local interests at stake. In holding the MPSC may not exercise the asserted regulatory authority to protect those interests, the Court has merely given effect to the regulatory scheme established by Congress in accordance with its intent. Pursuant to this scheme, it is for the Commission to evaluate and protect local interests, through its public convenience and necessity certification procedures, as it regulates interstate transportation on a comprehensive, nationwide basis. If these procedures are deemed to offer inadequate protection, then it is for Congress to fashion an appropriate remedy.

An order consistent with this opinion shall issue forthwith.

## JUDGMENT ORDER

In accordance with the Court's written opinion issued on June 16, 1988,

IT IS HEREBY ORDERED that the motions for summary judgment of National Steel Corporation and Panhandle Eastern Pipe Line Company are GRANTED;

IT IS FURTHER ORDERED that the motions for summary judgment of the Michigan Public Service Commission, William E. Long, Edwyna G. Anderson, Michigan Consolidated Gas Company, and Michigan Gas Utilities Company are DENIED;

IT IS FURTHER ORDERED that National Steel Corporation and Panhandle Eastern Pipe Line Company are awarded JUDGMENT in their favor, the asserted regulatory authority of the Michigan Pub-

lic Service Commission having been preempted by federal law.

IT IS FURTHER ORDERED that the preliminary injunction issued by This Court on November 2, 1987 is dissolved.